**ST. CHARLES CABLE TV, INC., Alexandra Realty Corporation, Energistics, Inc., GPA–CATV, Inc., Delta Telecommunications, a Limited Partnership, and Robert Broz, Plaintiffs,**

v.

**EAGLE COMTRONICS, INC., Defendant.**

**No. 83 Civ. 7126 (LFM).**

United States District Court, S.D. New York.

July 16, 1987.

Bloch, Graff, Danzig & Jelline by Howard Graff and Laura J. Kahn, New York City, for plaintiffs.

Scolaro, Shulman, Cohen Lawler & Burstein, P.C. by Walter D. Kogut and Ted Williams, Syracuse, N.Y., for defendant.

## OPINION

MacMAHON, District Judge.

Invoking diversity jurisdiction, plaintiffs brought this action against defendant Eagle Comtronics, Inc. ("Eagle") to recover damages allegedly caused by defective equipment purchased from Eagle for use in the St. Charles Parish, Louisiana, community antenna television system ("cable system"). Contending that both plaintiff, St. Charles Cable TV, Inc. ("SCC") and Eagle are citizens of the State of New York, Eagle moves to dismiss this action for lack of diversity, and for failure to join Cable Holdings, Inc. ("Cable Holdings"), a New York company which is affiliated with SCC, as an indispensable party. Eagle also seeks sanctions against SCC. SCC opposes Eagle's motions and moves for sanctions against Eagle and its counsel.

We held an evidentiary hearing on March 2, 1987 to resolve the underlying issues of fact pertinent to the motions. After carefully considering the exhibits, hearing and observing the witnesses, and weighing all of the evidence and the arguments of counsel, we find the following facts:

## FACTS

SCC is a corporation organized under the laws of the State of Louisiana,[1] with a registered office in New Orleans.[2] According to its by-laws, SCC's annual shareholders' meetings to elect directors "shall be held in the City of New York, State of New York;"[3] its special shareholders' meetings, other than to elect directors, "may be held ... within or without the State of Louisiana;"[4] and all of its board of directors' meetings "may be held either within or without the State of Louisiana."[5] All of SCC's "first directors," as well as its incorporators, were New York citizens.[6]

The Parish of St. Charles, Louisiana, by agreement dated November 13, 1981, granted SCC "the right, privilege and franchise to construct, operate, modify and maintain a Cable System in the West Bank area of the Parish of St. Charles, Louisiana" until 1995, subject to various conditions ("the franchise").[7] Donald Behrman,[8] the individual "responsible for the design of the [St. Charles Parish cable] system, the selection of its equipment and ... its ultimate construction,"[9] testified that such a franchise is necessary to operate a cable system in Louisiana;[10] that SCC holds franchises only from St. Charles Parish and neighboring Lafourche Parish, Louisiana;[11] and that SCC has never sought a franchise outside of Louisiana.[12]

In September 1982, SCC began selling fractional interests in the franchise to Delta Telecommunications Limited,[13] Energistics, Inc.,[14] GPA-CATV, Inc.,[15] and Robert Broz[16] (collectively referred to as "the owners"). None of these owners had "experience in the operation and management of [cable] systems...."[17] Thus, contemporaneous with their purchase agreements with SCC, the owners entered into "management contract[s]" with SCC[18] under which they retained SCC to operate and maintain the cable system for them.[19]

In compliance with the requirements of the franchise[20] and the management contracts,[21] SCC maintains an office in St. Charles Parish, Louisiana, with a manager[22] and "six or eight" employees.[23] This office serves as "the headquarters for the maintenance crews and the people who install service to subscribers, the people who have contact with the subscribers either in person coming into the office or by telephone."[24]

1. Exhibit ("Ex. ___") PP. At the time of its incorporation, SCC was known as "Cable Holdings of St. Charles, Inc." Trial Transcript ("Tr. ___") at 4; Ex. SSSS at p. 7; Ex. ZZZZ.

2. Ex. QQ, Art. I, § 1.

3. *Id.,* Art. II, § 1.

4. *Id.,* Art. III, § 1.

5. *Id.,* Art. VI, § 1.

6. Ex. PP.

7. Ex. 34 at § 4; Tr. 15.

8. Behrman is Chief Engineer for Cable Holdings, Inc. Tr. 13, 22.

9. Tr. 14; *see also* Tr. 22–23. Behrman also acknowledged that he had the primary responsibility for negotiating the contracts to purchase the equipment at issue in this case. Tr. 27–29.

10. Tr. 14–15.

11. Tr. 15.

12. *Id.*

13. Exs. RR–3, RR–4.

14. Exs. VV–3, VV–4.

15. Ex. WW–2.

16. Ex. XX–2.

17. ¶ 2 of Exs. RR–5, RR–6, VV–5, VV–6, WW–3 and XX–3.

18. Exs. RR–5, RR–6 (Delta Telecommunications Limited); Exs. VV–5, VV–6 (Energistics, Inc.); Ex. WW–3 (GPA–CATV, Inc.); and Ex. XX–3 (Robert Broz).

19. ¶ 2 of each exhibit referrred to in note 18, *supra.*

20. Ex. 34 at § 29; Tr. 17.

21. ¶ 2(d) of each exhibit referred to in note 18, *supra.*

22. Tr. 17.

23. Tr. 20.

24. Tr. 17. Defense counsel acknowledged that "[w]hat is done in Louisianna (sic) [by SCC] is ... the blue collar work of interfacing with

According to Behrman, SCC's "day-to-day business decisions" are made "[f]or the most part" by its Louisiana staff,[25] which also compiles billing information for use by an independent billing agency, Cable Data, Inc. of Sacramento, California.[26] The subscribers, however, pay directly to SCC's St. Charles Parish office.[27] Their remissions, the sole source of revenue generated by the cable system,[28] are deposited into SCC's Luling, Louisiana, bank account.[29]

In addition to its Louisiana office, SCC maintains an office at 745 Fifth Avenue in New York City,[30] in the same building as an SCC affiliated corporation,[31] Cable Holdings.[32] There is no evidence, however, that SCC is a subsidiary of Cable Holdings or that Cable Holdings has any ownership interest in SCC. Richard Treibick is an officer and majority shareholder of both SCC[33] and Cable Holdings.[34] He testified that "all of the companies which [he controls] ... are pretty much the same. They are slightly interchangeable."[35] Cable Holdings provides a variety of "essentially administrative services" to SCC,[36] and Treibick, from his New York City office, makes basically all of SCC's executive decisions.[37] In light of the evidence concerning the number of SCC's Louisiana employees and the day-to-day operations and functions which they perform there, we reject defendant's contention that Treibick makes "all" of SCC's decisions from New York.

Cable Holdings also provides bookkeeping[38] and payment[39] services to SCC. SCC transfers the funds generated by the St. Charles Parish cable system from its Luling, Louisiana, bank account to an omnibus bank account in New York City,[40] and, through Cable Holdings, pays all of the vendors of the St. Charles Parish cable system.[41] Cable Holdings also provides payroll services to SCC through Automatic Data Processing of New Jersey.[42] This service involves using funds deposited into another account, maintained by Cable Holdings Finance Corporation at Manufacturers Hanover Trust.[43] Cable Holdings also provides SCC with engineering services.[44]

---

subscribers, and installing whatever equipment is done there...." Tr. 11.

**25.** Tr. 20.

**26.** Tr. 17–18; Ex. SSSS at p. 17. Behrman also testified that he negotiated the most recent contract with Cable Data, Inc. on behalf of SCC. Tr. 30.

**27.** Tr. 18; Ex. SSSS at p. 15.

**28.** Tr. 16.

**29.** Ex. SSSS at pp. 14–15.

**30.** Exs. UUU, RR–5 at ¶ 9, RR–6 at ¶ 9, VV–5 at ¶ 9, VV–6 at ¶ 9, WW–3 at ¶ 9, and XX–3 at ¶ 9. Additionally, SCC lists a New York City post office box as its return address on its 1981 federal income tax return. Ex. ZZZZ.

**31.** See Ex. SSSS at pp. 3–18. Indeed, Eagle consistently has referred to SCC as an "affiliate" of Cable Holdings. See ¶ 10 of Amended Answer to Second Amended Complaint; Defendant's Memorandum of Law in Support of Motion to Dismiss at p. 3; and Defendant's Proposed Findings of Fact at ¶ 6.

**32.** Tr. 21–22.

**33.** Ex. SSSS at pp. 3, 6. Additionally, Treibick also holds a voting trust for all of the other

shares, thereby making him "the sole stockholder for voting purposes." *Id.* at p. 6.

**34.** *Id.* at pp. 5–6. Treibick also testified that he is paid only by Cable Holdings and one of its affiliates, Alexandra Realty Corporation. *Id.* at pp. 3, 18.

**35.** *Id.* at p. 4.

**36.** *Id.* at p. 10; *see also* Tr. 26.

**37.** *See* Tr. 18, 20–21.

**38.** Ex. SSSS at p. 17. Treibick described Cable Holdings' bookkeeping services as "[p]ayables, ledgers, reconciliations, everything." *Id.*

**39.** *Id.* at pp. 11–14. Treibick also testified that withdrawal authority on SCC's local account, in which SCC does not maintain "any meaningful balances," is limited to himself, Robert Broz, and Eli Haber. *Id.* at pp. 12–13.

**40.** *Id.* at pp. 11–12. This omnibus account is maintained at the Bank of New York by Alexandra Realty Corporation. *Id.* at p. 12.

**41.** *Id.* at p. 11.

**42.** *Id.* at pp. 16–17.

**43.** *Id.* at p. 17. Treibick is also an officer and director of Cable Holdings Finance Corporation. *Id.*

**44.** *Id.* at p. 10. *See also* note 8, *supra,* and accompanying text.

In October 1982, defendant Eagle, a New York corporation,[45] agreed to sell equipment for use in the St. Charles Parish cable system.[46] The sales orders and invoices memorializing the sale of the equipment[47] show that Eagle would "BILL TO:"

CABLE HOLDINGS, INC.

745 FIFTH AVE STE 405

NEW YORK, N.Y. 10022

but that Eagle would "SHIP TO:"

CABLE HOLDINGS/ST CHARLES INC[48]

1500 PAUL MAILLARD ROAD

LULING, LA 70070

Although somewhat evasive, Joseph Ostuni, Eagle's vice-president,[49] testified that, although Eagle was billing Cable Holdings for the equipment, it was not shipping the equipment to Cable Holdings but "to somebody else" in Luling.[50] Behrman testified that the equipment was in fact shipped to St. Charles Parish and that it was used solely to construct the St. Charles Parish cable system.[51]

According to Ostuni, Eagle requested and received a good faith payment of $50,000.00 "[t]o be applied for [the] equipment that was shipped to St. Charles...."[52] This payment was made by check, dated March 1, 1983, drawn on the Bank of New York,[53] and bearing at the top a handwritten notation "Cable Holdings of St. Charles, Inc."[54] This notation, according to Ostuni, could simply reflect which of the various accounts of Cable Holdings should be credited.[55] On the other hand, this notation is also consistent with Cable Holdings' payment services to SCC,[56] or may indicate that SCC paid Eagle directly for the equipment. At this stage of this action, however, we need not determine "who paid" for the equipment.[57]

## DISCUSSION

### Subject Matter Jurisdiction

Eagle contends that diversity jurisdiction is lacking because both it and SCC are citizens of New York.[58] We are satisfied, however, that SCC has demonstrated by competent proof[59] that its principal place

45. ¶ 4 of Second Amended Complaint; ¶ 1 of Amended Answer to Second Amended Complaint.

46. SCC contends that it entered into the sales agreement with Eagle. ¶ 9 of Second Amended Complaint. Eagle, however, refutes this contention and asserts that the sales order was placed by Cable Holdings. ¶ 4 of Amended Answer to Second Amended Complaint.

47. Exs. L, N, O, P, Q, R and S.

48. Some of the sales orders and invoices add "P.O. BOX 62" to this address.

49. Tr. 33.

50. Tr. 46. *See also* Tr. 37.

51. Tr. 18–20. Ostuni testified that he was aware of the St. Charles Parish cable system and knew that the equipment was to be used in it. Tr. 37.

52. Tr. 38.

53. Ex. 3. Treibick testified that the omnibus bank account from which Cable Holdings renders payment services to SCC is maintained at the Bank of New York. Ex. SSSS at pp. 11–12.

54. Ex. 3. "Cable Holdings of St. Charles, Inc." is SCC's former name. *See* note 1, *supra.*

55. Tr. 38.

56. *See* note 41, *supra,* and accompanying text.

57. Another check made payable to Eagle and drawn on the Bank of New York, dated December 30, 1982, in the amount of $12,547.00, was received in evidence. Ex. 79. There is, however, no evidence that Eagle ever received this check. Thus, we are not considering this exhibit in deciding the issues here.

58. *See Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

For purposes of diversity jurisdiction, a corporation is deemed a citizen of the state of its incorporation and of the state where it has its principal place of business. 28 U.S.C. § 1332(c); *R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 654 (2d Cir.1979). There is no dispute that Eagle is a citizen of New York and that SCC was incorporated in Louisiana. *See* pp. 2, 5, *supra.* Thus, we need only determine the location of SCC's principal place of business.

59. *See, e.g., McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936).

of business and place of incorporation is Louisiana, and that we, therefore, have diversity—subject matter—jurisdiction.

Two tests have evolved for determining the location of a corporation's principal place of business.[60] On the one hand, a corporation which has its operations spread across numerous states has its principal place of business at " 'the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective.' " [61] On the other hand, a corporation which does not have its operations spread across numerous states, but is centralized, has its principal place of business where it "has its most extensive contacts with, or greatest impact on, the general public." [62]

In *R.G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651 (2d Cir.1979), the court held that Mushroom Makers, which was incorporated in Mississippi and had extensive contacts there, was also a citizen of New York for jurisdictional purposes. Mushroom Makers was affiliated [63] with a Mississippi-based holding company. Although the overall policies for Mushroom Makers were set in Mississippi and much of its administrative and manufacturing requirements were contracted out to affiliated Mississippi firms, the court held that it had its most extensive contacts with the public in New York and, therefore, had its principal place of business in New York. This decision was based on the fact that New York was where Mushroom Makers'

line of clothing was designed, the fabrics for its garments selected and purchased, its finished product advertised and sold, and its accounts receivable financed.[64]

■ Like Mushroom Makers, which had its principal place of business in New York, although its overall policies were set in Mississippi, SCC receives numerous executive and administrative services from New York, primarily through Cable Holdings, an affiliated corporation.[65] Nevertheless, SCC's primary function is to service the St. Charles Parish cable system. To this end, SCC's Louisiana employees run the cable system's day-to-day operations, such as maintaining the equipment, handling subscriber complaints, and receiving subscriber payments. In short, SCC's operations are not spread across numerous states, but are centralized in Louisiana. Indeed, Eagle concedes that SCC is not a "far-flung corporation." [66] SCC's most extensive contacts with and greatest impact on the public are in Louisiana, which is not only the place of its incorporation, but also its principal place of business. SCC is a citizen only of Louisiana, thereby satisfying diversity jurisdiction.

Eagle also moves to dismiss this action pursuant to Fed.R.Civ.P. 12(h)(3), contending that plaintiffs, other than SCC, which were recently joined as parties pursuant to a stipulation and order, "have not provided jurisdictional allegations with regard to their respective residences." [67] Although afforded the opportunity to raise this contention at the March 2, 1987 hearing, Eagle failed to do so but seeks to raise it now for

**60.** *R.G. Barry Corp. v. Mushroom Makers, Inc., supra,* 612 F.2d at 654–55.

**61.** *Id.,* 612 F.2d at 655 (quoting *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862, 865 (S.D.N.Y.1959)).

**62.** *R.G. Barry Corp. v. Mushroom Makers, Inc., supra,* 612 F.2d at 655; *Inland Rubber Corp. v. Triple A Tire Serv., Inc.,* 220 F.Supp. 490 (S.D.N.Y.1963).

**63.** The court used the term "affiliate" to denote corporations which "are commonly owned and managed by the same individuals." *R.G. Barry Corp. v. Mushroom Makers, Inc., supra,* 612 F.2d at 656 n. 8. The evidence here discloses a

similar affiliation between SCC and Cable Holdings. *See* note 31, *supra,* and accompanying text.

**64.** *R.G. Barry Corp. v. Mushroom Makers, Inc., supra,* 612 F.2d at 655–57.

**65.** *See* p. 4, *supra.* The parent-subsidiary cases on which Eagle relies are inapposite because the evidence discloses only that SCC and Cable Holdings are affiliated corporations. There is no proof that Cable Holdings possesses any ownership interest in SCC.

**66.** Tr. 51.

**67.** Eagle's Memorandum of Law at p. 4.

the first time in its post-hearing memorandum of law.

■ On February 6, 1987, we signed a stipulation and order adding as party plaintiffs in this action Alexandra Realty, Inc., Energistics, Inc., Delta Telecommunications Limited Partnership, and Robert Broz, all of whom, with the exception of Alexandra Realty, Inc., previously submitted affidavits "ratifying" this litigation and setting forth Connecticut as their state of citizenship.[68] Moreover, the evidence at the hearing corroborates the fact that Connecticut is the state of citizenship for Energistics Inc.,[69] Delta Telecommunications Limited Partnership,[70] and Robert Broz.[71] Behrman's uncontroverted testimony established that Alexandra Realty, Inc. was located "[i]n Greenwich, Connecticut."[72] In the absence of any evidence to the contrary, these averments are sufficient. We hereby dismiss GPA–CATV, Inc., however, as a party plaintiff, pursuant to Rule 21, Fed.R.Civ.P., without prejudice to reinstatement upon motion or stipulation, because GPA–CATV, Inc., which has attempted to join this litigation, was not a party to the February 6, 1987 stipulation and order.

*Rule 19, Fed.R.Civ.P.*

■ Eagle also moves to dismiss this action on the ground that SCC has failed to join an indispensable party, Cable Holdings. In essence, Eagle contends that Cable Holdings is an indispensable party because it was an agent for an undisclosed principal—SCC—during the purchase of the cable equipment from Eagle. Thus, Eagle argues that Cable Holdings is liable to it on the sales contracts.[73] Regardless of whether Eagle knew, when selling the cable equipment at issue here, that SCC was Cable Holdings' principal, Cable Holdings is not an indispensable party to this action.

Determining indispensability is a procedural matter governed by Rule 19, Fed.R. Civ.P.[74] In a diversity action such as this, however, we must apply the standards of Rule 19 to rights and interests that are derived from and defined by the laws of the State of New York.[75]

Under New York law, an agent for a disclosed principal is not liable for contracts entered into between its principal and a third party, absent "clear and explicit" evidence of the agent's intention to substitute or superadd its personal liability for, or to, that of its principal.[76] If we assume, without deciding, that SCC was Cable Holdings' disclosed principal, then Cable Holdings would not be contractually liable to Eagle because there is no evidence from which we can infer Cable Holdings' intention to incur personal liability on the contracts. Hence, Cable Holdings would be neither an indispensable nor a proper party to this action.

Conversely, if we assume, without deciding, that Eagle was unaware that SCC was Cable Holdings' principal, then we reach the same result.[77] Under New York law, when an agent for an undisclosed principal contracts with a third party, both the agent and the principal are jointly and severally

---

**68.** *See* Ex. C to Graff Affidavit of March 26, 1987.

**69.** Exs. VV–3, VV–4, VV–5, VV–6.

**70.** Exs. RR–3, RR–4, RR–5, RR–6.

**71.** Exs. XX–2, XX–3.

**72.** Tr. 25.

**73.** Eagle, in its post-hearing memorandum of law, argues: "Cable Holdings should not be permitted to evade responsibility on this contract by the mere fact that the goods were shipped to [SCC], a corporation with no assets." Eagle's Memorandum of Law at p. 6. *See also* Tr. 57–58.

**74.** *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

**75.** *Jones Knitting Corp. v. A.M. Pullen & Co.,* 50 F.R.D. 311, 314 (S.D.N.Y.1970) (footnote omitted). *See also* 3A J. Moore, Moore's Federal Practice ¶ 19.01–1[4] at 19–28 to 19–29 (2d ed. 1985).

**76.** *Savoy Record Co. v. Cardinal Export Corp.,* 15 N.Y.2d 1, 4, 203 N.E.2d 206, 207, 254 N.Y. S.2d 521, 523 (1964).

**77.** *See also* 3A J. Moore, Moore's Federal Practice ¶ 19.10, at 19–200 to 19–201 & footnote 11. (2d ed. 1985).

liable to the third party, provided the agent acted according to his authority, or the principal subsequently ratifies and confirms the agent's acts.[78] Here, there is no evidence to suggest that Cable Holdings exceeded its authority in dealing with Eagle. Moreover, even if it did, SCC's use of the cable equipment in the St. Charles Parish cable system is evidence that SCC ratified or confirmed Cable Holdings' purchase of the equipment from Eagle. Thus, if we assume, without deciding, that SCC was Cable Holdings' undisclosed principal, then SCC and Cable Holdings would still be jointly and severally liable to Eagle.[79] Therefore, Cable Holdings would not be an indispensable party because parties which are jointly and severally liable are not "indispensable" within the meaning of Rule 19.[80]

## Sanctions

■ SCC moves for sanctions against Eagle and its counsel pursuant to our inherent equitable powers, Rule 11, Fed.R. Civ.P., and 28 U.S.C. § 1927, and bases its motion on two grounds: (1) Eagle should have renewed its motion to dismiss for lack of subject matter jurisdiction during the prior proceedings before the Special Master, and (2) Eagle failed to confront legal precedent in its motion to dismiss. Eagle, on the other hand, moves for sanctions against SCC, alleging that SCC's motion for sanctions is frivolous.

It would have been preferable for Eagle to move to dismiss, pursuant to Rule 12(b)(1), Fed.R.Civ.P., during the proceedings conducted by the Special Master so that he could frame the jurisdictional issue for us. However, a motion to dismiss for lack of subject matter jurisdiction may be made by anyone at any time and may be raised by us *sua sponte.*[81] We, therefore, will not impose sanctions upon Eagle or its counsel for failure to renew the jurisdictional objection prior to March 2, 1987. SCC also moves for sanctions on the ground that Eagle, in its motion to dismiss, neglected to distinguish the facts of this action from precedent, such as, *R.G. Barry Corp. v. Mushroom Makers, Inc., supra.* The better practice would have been for Eagle to attempt, from the outset, to distinguish contrary precedent. However, we are unwilling to declare that Eagle's reliance on other cases, which apply the "nerve center" test for jurisdictional purposes, rises to the level of bad faith, vexatious, or wanton litigation. Indeed, the jurisdictional question in this action is one on which there is substantial ground for difference of opinion. We, therefore, deny SCC's motion for sanctions.[82] Likewise, we deny Eagle's motion for sanctions because it is without basis.[83]

## Certification for Interlocutory Appeal

■ This interlocutory order involves controlling questions of law concerning

---

**78.** *Industrial Mfrs., Inc. v. Bangor Mills, Inc.,* 283 A.D. 113, 117, 126 N.Y.S.2d 508, 512 (1st Dep't 1953), *aff'd,* 307 N.Y. 746, 121 N.E.2d 552 (1954); N.Y.CPLR § 3002(b) (McKinney 1974).

**79.** N.Y.CPLR § 3002(b) (McKinney 1974). The practice commentary to § 3002(b) states that this "provision is procedural only." *See* N.Y. CPLR § 3002(b), Practice Commentary § 3002:21, at 540 (McKinney 1974). Although we have found no federal case applying § 3002(b), we do not believe that the commentator intended this statement to mean that § 3002(b) is procedural for purposes of analysis under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, notwithstanding the practice commentary, we will apply § 3002(b) in order to determine whether Cable Holdings is an indispensable party to this action. *See Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Phillips v. Smith,* 717 F.2d 44, 49 (2d Cir.1983) ("Comity requires that federal courts respect state proce-

dural rules to the extent those rules do not unjustly extinguish rights guaranteed by the federal Constitution."), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984). *See also Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir.1976) (we "stand in the shoes of a state court judge" when ruling on contract issues in a diversity case).

**80.** *Kerr v. Compagnie De Ultramar,* 250 F.2d 860, 863 (2d Cir.1958); *Fradkin Bros. Furniture Village, Inc. v. Bradford Trust Co.,* 89 F.R.D. 667, 671 (S.D.N.Y.1981); *Jones Knitting Corp. v. A.M. Pullen & Co., supra,* 50 F.R.D. at 315.

**81.** *Air Cargo, Inc. v. Local Union 851,* 733 F.2d 241, 247 n. 5 (2d Cir.1984).

**82.** *See, e.g., Oliveri v. Thompson,* 803 F.2d 1265 (2d Cir.1986).

**83.** *Id.*

subject matter jurisdiction and joinder of parties. These questions, if determined otherwise, may result in the immediate termination of this action. We, therefore, certify that this order involves controlling questions of law as to which there is substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of the litigation.[84] In the event that any of the parties desires to appeal from this order, an appropriate petition for permission to appeal, in accordance with Rule 5, Fed.R.App.P., shall be filed with the United States Court of Appeals for the Second Circuit within ten (10) days after the entry of this order.[85]

## CONCLUSION

The foregoing constitutes our findings of fact and conclusions of law, pursuant to Rule 52, Fed.R.Civ.P.

Accordingly:

(1) We deny defendant's motion to dismiss this action pursuant to Rule 12(b)(1), Fed.R.Civ.P., for lack of diversity jurisdiction;

(2) We dismiss, *sua sponte*, GPA–CATV, Inc. as a party plaintiff, without prejudice to reinstatement upon motion or stipulation, pursuant to Rule 21, Fed.R.Civ.P., for failure to join this action properly;

(3) We deny defendant's motion to dismiss this action pursuant to Rule 12(b)(7), Fed.R.Civ.P., for failure to join an indispensable party;

(4) We deny all motions for sanctions; and

(5) We certify that this order involves controlling questions of law as to which there is substantial ground for difference of opinion, and that an immediate appeal

may materially advance the ultimate termination of the litigation.

So ordered.

---

**84.** 28 U.S.C. § 1292(b); *English v. Seaboard Coast Line R. Co.,* 465 F.2d 43 (5th Cir.1972) (interlocutory appeal permitted in order to determine joinder of parties question); *Movielab, Inc. v. Berkey Photo, Inc.,* 452 F.2d 662 (2d Cir.1971) (interlocutory appeal permitted in order to determine subject matter jurisdiction question); *Brown v. Bullock,* 294 F.2d 415, 417 (2d Cir.1961); *State Teachers Retirement Bd. v. Fluor Corp.,* 84 F.R.D. 38, 39 (S.D.N.Y.1979); 9 J. Moore, Moore's Federal Practice ¶ 110.22 at pp. 256–67 (2d ed. 1985).

**85.** 28 U.S.C. § 1292(b).