ST. CHARLES CABLE TV, INC., Alexandria Realty Corporation, Energistics, Inc., Delta Telecommunications, a limited partnership, and Robert Broz, Plaintiffs,

v.

EAGLE COMTRONICS, INC., Defendant,

v.

CABLE HOLDINGS, INC., Counterclaim Defendant.

No. 83 Civ. 7126 (LFM).

United States District Court, S.D. New York.

May 19, 1988.

Dow Lohnes & Albertson by Howard Graff and Laura J. Kahn, New York City, for plaintiffs and counterclaim defendant.

Scolaro, Shulman, Cohen, Lawler & Burstein, P.C. by Walter D. Kogut and Ted H. Williams, Syracuse, N.Y., for defendant.

## OPINION

MacMAHON, District Judge.

Plaintiff, St. Charles Cable TV, Inc. ("SCC"), the buyer, brings this action against the seller, defendant Eagle Comtronics, Inc. ("Eagle"), for damages for breach of warranty, fraud, and negligent misrepresentation by Eagle in the sale of allegedly defective descramblers to SCC. Alexandria Realty Corp., Energistics, Inc., Delta Telecommunications, and Robert Broz (collectively "the licensees") join SCC's action as nominal coplaintiffs whose claims must stand or fall with SCC's. Eagle asserts counterclaims against SCC and its affiliate, Cable Holdings, Inc. ("Cable Holdings"), for the balance due on the purchase price and money claimed under other provisions of the underlying agreement. Eagle also asserts a counterclaim against the licensees, alleging that as owners of the cable system they are liable on a conversion theory for receiving wrongfully obtained descramblers.

The action was tried before the court, without a jury, on September 28, 29 and 30 and October 19, 20, 21, 28 and 29, 1987. The trial was bifurcated for determination of liability first, reserving the issue of damages for future resolution, if necessary.

After carefully considering the exhibits, hearing and observing the witnesses, weighing all of the evidence and arguments of counsel, and bearing in mind that it is not the quantity but the quality of the evidence that is ultimately determinative, we now make the following findings of fact and conclusions of law.

## BACKGROUND

SCC is a Louisiana corporation with its principal place of business in Luling, Louisiana, where it constructed and now operates a cable television system pursuant to a franchise granted by the Parish of St. Charles. The licensees are citizens of Connecticut whose connection with this litiga-

tion arises from their present ownership interests in the SCC cable system.[1] Defendant Eagle, a New York corporation with its principal place of business in Syracuse, New York, manufactured and sold addressable descramblers[2] to Cable Holdings for use in the SCC cable system.

The sale resulted from a series of meetings and telephone conversations between Donald Behrman ("Behrman") and various Eagle representatives in the summer and fall of 1982. Behrman is chief engineer for counterclaim defendant Cable Holdings, a New York affiliate of SCC in the business of providing management and engineering services for cable television systems. Behrman spoke with Eagle representatives ten to twenty times (Trial Transcript ("Tr. ____") 70–85, 920–21). He also visited Eagle's plant in Syracuse in September 1982, where he observed the descramblers and discussed technical details about them with Eagle engineers (Tr. 73–75, 244–45).

Behrman knew, at least from his first visit, that Eagle's descrambler was only a prototype and that, although the prototypes had been tested in the laboratory and in field demonstrations by Eagle, they had not been used in any cable system (Tr. 244–46, 256–57, 787–88). Nevertheless, Cable Holdings decided that SCC would become the first cable system to use the Eagle descramblers (Tr. 257). Later, one of the descrambler components was modified as a result of further testing by an independent laboratory chosen by Behrman (Tr. 78–81, 248–52). Finally, because Cable Holdings was a multiple system operator representing a potential source for future sales, Eagle agreed to a substantial reduction of the per unit price of descramblers (Tr. 239–44, 841–45; Defendant's Exhibits ("DX ____") M, SSSS at 61–62).

On October 12, 1982, Behrman telephoned an order for 4,000 Eagle descramblers together with other equipment needed to set up the SCC system (Tr. 85–86; DX L, N). Not surprisingly, some statements made during the negotiations leading to the purchase order are disputed. The parties agree, however, that (1) the descramblers were warranted by Eagle for a period of one and one-half years, with an additional year and one-half fixed-price replacement option; (2) the price was $52.50 per descrambler; and (3) gas tubes for surge protection were to be added to the descramblers. The parties disagree, how-

---

1. The actual ownership of the cable system and equipment is somewhat complicated. After obtaining the franchise from the Parish of St. Charles, SCC sold licenses to operate cable systems within the Parish to Delta Telecommunications, Energistics, Inc., GPA CATV, Inc., and Robert Broz, the president of SCC. At the time they purchased the licenses, the licensees also purchased equipment to operate the systems from Alexandria Realty Corp., a construction company affiliated with SCC, and entered into a management contract with SCC to run the systems. Essentially, SCC operated the system while the assets were owned by the licensees (Transcript ("Tr. ____") 658–674; Defendant's Exhibits ("DX ____") RR–3, RR–4, VV–3, VV–4, WW–2, XX–2). SCC retained an option to repurchase the licenses (Tr. 722–23). The licensees, except for GPA CATV, Inc., were added as nominal co-plaintiffs in this action by a stipulation and order filed February 6, 1987. GPA CATV, Inc. did not sign the stipulation and was dismissed *sua sponte*. *See St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*, 664 F.Supp. 824 (S.D.N.Y.1987) (Opinion denying defendant's motion to dismiss for lack of diversity jurisdiction and for failure to join an indispensable party, and certifying decision for immediate appeal).

2. Cable television systems receive television signals from satellites and local stations at a central point, the "head end." The signals are distributed to individual subscribers' homes via the cable wiring network. Once hooked up to the cable system, subscribers may choose to purchase additional programming, such as HBO and SHOWTIME. Scrambling is used to ensure that subscribers receive only the additional programming for which they have paid.

 An addressable cable system consists of a scrambler, located in the head end, which scrambles television signals for the additional programming before the signals are sent through the cable lines and into the subscribers' homes. The descrambler, located in each subscriber's home, reads the code and unscrambles the signals provided the subscriber has signed up for the additional service. The addressable aspect of the system is that the descrambler can be instructed from the head end which scrambled channels the subscriber is authorized to receive. Changes in the level of authorized service can be made without going to the subscriber's home.

ever, on the content of Eagle's warranty and on the other terms of their agreement.

SCC contends that as part of the agreement Eagle made the following representations: (1) the addressable descramblers were based on proven technology; (2) they were more secure from tampering than other addressable descramblers on the market; (3) their failure rate would be less than four percent; and (4) Eagle would stand behind the addressable system and fully support it. Eagle denies making any representation concerning the failure rate and asserts that the other representations were either true or were not part of the basis of the agreement, as required by N.Y. UCC § 2–313(1)(a). Eagle further maintains that the sole agreement between the parties is contained in Eagle's written sales order acknowledgment forms.

Eagle sent sales order acknowledgment forms to Cable Holdings following the initial October 12, 1982 telephone order from Behrman and on each subsequent order (DX L). Each acknowledgment, on its face, states the price, the number of descramblers, the warranty period, and that gas tubes would be added to the descramblers. A conspicuous note, at the bottom of the forms, states: "Subject to the Terms and Conditions on Reverse Side." Those terms, in relevant part, are that the order form constitutes the entire and only contract of sale; that any varying terms or modifications are excluded unless accepted by Eagle in writing; that the buyer relies on its own knowledge of the subject matter and not on any representations by the seller; that Eagle warrants the goods to be free from defects in material and workmanship under normal use and service for a period of ninety days from delivery; that the buyer's remedy under Eagle's warranty is limited to repair or exchange of defective goods; that all other warranties are excluded; that the buyer must provide notice of defects within fifteen days of delivery; that the buyer is responsible for freight charges and legal costs and interest arising out of any contract dispute; and that New York law governs the agreement (Tr. 214–15; DX L). Invoices accompanying each delivery of de-

scramblers included the same printed form (Tr. 214–15; DX L).

Neither Cable Holdings nor SCC ever objected to the terms in the acknowledgment form, but no representative of Cable Holdings or SCC ever signed the form and defendant produced no direct evidence that either corporation knew of the terms and conditions.

In November 1982, Eagle began delivering descramblers at the rate of a few hundred every week (Tr. 86). Shortly thereafter, SCC complained that the descramblers caused a "beat" or minor interference on one of thirty-three channels (Tr. 93–95, 791–92). Eagle accepted a return of the descramblers and repaired them to eliminate the beat problem (Tr. 284–85, 791–96; Plaintiffs' Exhibit ("PX ___") 4; DX Z).

In February 1983, Behrman advised Eagle that he had learned that the descrambler was vulnerable to a certain method of tampering which could descramble all scrambled channels, thereby permitting a subscriber to steal additional cable channels (Tr. 118–20). Eagle proposed that a crowbar clamp-down circuit be added to the descramblers to prevent that method of tampering (Tr. 124–25, 796–800). Behrman reviewed the schematics of the crowbar circuit during a two-day trip to Syracuse and approved the modification (Tr. 125, 796–800). In addition, Behrman ordered 150 traps from Eagle to prevent theft of scrambled channels until the modified descramblers were installed (Tr. 264–66; DX Q). Eagle added the crowbar circuit to 399 descramblers which had not been returned to SCC after the December modification for the beat problem and to 1,500 additional descramblers ordered by Behrman on January 20, 1983 (Tr. 856–57; DX AA, O). No additional charge was made for this modification (Tr. 910). The crowbar circuit worked and prevented theft of signals by the tampering method Behrman had feared (Tr. 187).

In March 1983, Eagle was paid $50,-000.00 (Tr. 699–702; PX 3), leaving a balance of $285,846.00. Eagle agreed at that

time to add the crowbar circuit to all of the remaining descramblers in SCC's possession as they were removed from subscribers' homes on an attrition basis (Tr. 132–34).

In April 1983, Eagle developed another design modification called an "auto-tracking circuit" and, in response to SCC's complaints about descrambler performance,[3] gave SCC the option of taking new units incorporating the auto-tracking and crowbar circuits ("Type 2"), or returning the original units ("Type 1") for modification (Tr. 132–33, 858–62). SCC chose Type 2 descramblers (Tr. 132–33). Eagle sent sales order acknowledgments stating on their face that "credit will be issued against invoice when old units are returned" (DX R). The acknowledgments also contained the same terms and conditions on the reverse side as those related above.

Eagle began shipping the Type 2 descramblers to SCC on June 25, 1983 and continued shipments of a few hundred every week or two until all 5,500 were delivered by September 1, 1983 (Tr. 188; DX EEEEE). Behrman admitted that the parties intended that SCC would return all the old Type 1 descramblers as they were replaced by the new Type 2 descramblers (Tr. 200–01) and that Eagle would credit SCC with $52.50 for each of the returned Type 1 descramblers against the outstanding balance of $285,846.00 still due on the Type 1 descramblers. In addition, Eagle would invoice $52.50 for each of the Type 2 descramblers (Tr. 867–71). In accordance with this understanding, SCC returned 401 of the Type 1 descramblers on June 14, 1983, and Eagle credited $21,052.50 to SCC's account (DX T). SCC did not return any other descramblers, however, until well after the instant action was filed.

3. Behrman's testimony and plaintiffs' documents describe problems with the descramblers only in vague, general, terms (Tr. 126–31; PX 37, 39). Moreover, Behrman admitted that he could identify no descrambler that had been sent to Eagle for warranty repair and returned to SCC with the same problem (Tr. 284–85). Accordingly, we reject plaintiffs' assertion that Eagle's offer to replace Type 1 de-

On September 9, 1983, Eagle representatives met with SCC and Cable Holdings representatives at a trade show in Atlanta, Georgia (Tr. 192–94, 883). Behrman advised Eagle that the Type 2 descramblers were working well and that Cable Holdings was considering using them in its other systems (Tr. 218–20). He said, however, that it was expected that Eagle would share the costs, estimated from $100,000.00 to $200,000.00, incurred in replacing Type 1 descramblers with Type 2 descramblers (Tr. 219–20, 884–85). Eagle's representatives replied that it would sue if SCC and Cable Holdings did not pay their bill (Tr. 220, 885).

On September 28, 1983, SCC commenced this action, claiming that both the original descramblers and the replacements were defective. In January 1984, SCC returned ten Type 2 descramblers, which Eagle confirmed were failures. Another thousand Type 2 descramblers were returned in April 1984, approximately half of which were confirmed to be failures by Eagle. Eagle refused to replace the returned descramblers until SCC paid its bill. SCC continued to use Eagle descramblers in its cable television system through the end of 1986, when it changed to Zenith descramblers.

## DISCUSSION

### Jurisdiction

We determined previously that diversity jurisdiction exists in this action.[4] We found SCC to be a citizen of Louisiana, the licensees to be citizens of Connecticut, and Eagle to be a citizen of New York. Subsequently, we permitted Eagle to assert counterclaims against Cable Holdings, a citizen of New York, pursuant to our ancillary jurisdiction.[5] We adhere to our earlier jur-

scramblers with Type 2 descramblers meant that all Type 1 descramblers were defective.

4. *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc., supra.*

5. *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.,* No. 83 Civ. 7126 (S.D.N.Y. Sept. 25, 1987) (order granting defendant's motion for leave to assert counterclaims).

isdictional determinations and turn to the merits.

*Choice of Law*

 Initially, we must determine whether to apply New York or Louisiana law to this dispute. In diversity cases, a federal court must apply the choice of law rules of the state in which it sits.[6] In contract disputes, New York uses a "center of gravity" or "grouping of contacts" approach in solving choice of law problems [7] and applies the law of the jurisdiction which has the most significant contacts with the matter in dispute.[8]

Although SCC is a Louisiana corporation and the descramblers were used in Louisiana, the significant contacts here were with New York. Eagle and Cable Holdings are both New York corporations. All negotiations, including the oral agreement on October 12, 1982, took place in New York.[9] The descramblers were demonstrated to Behrman at Eagle's plant in Syracuse, New York. Moreover, Eagle clearly intended that New York law apply to the agreement by designating New York as the forum in the sales acknowlegments.[10] There is no indication that Behrman, who has acted as purchasing agent for Cable Holdings' affiliates in other states as well (Tr. 248), intended that Louisiana law apply.

We hold that New York's interest in applying the UCC, with its attendant goals of promoting commercial transactions through simplification and uniformity, outweighs any interest Louisiana may have in this transaction.

*Contract Information*

 New York has adopted the UCC provisions governing the sale of goods. The relevant provision for determining whether a contract has been formed, NY UCC § 2–207(1) (McKinney 1964), provides that: "A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional terms." Official Comment 1 to the section states that it is intended to apply where "an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal acknowledgments or memoranda embodying the terms so far as agreed upon and adding terms not discussed."

Based on the testimony of Behrman and Eagle's sales manager, Chester Syp ("Syp"), we conclude that an oral agreement was reached by the parties on October 12, 1982. Behrman testified that the extensive negotiations between the parties ended with the determination of the price per unit and his statement that "we have a deal" (Tr. 85). Syp's testimony was less conclusive, but essentially he agreed that all negotiated terms were settled by telephone calls on October 12 (Tr. 837–38).

This conclusion is not changed by Eagle's acknowledgment of sale form. We find that Eagle's acknowledgment form was not "expressly made conditional on assent to the additional terms." First, once the parties have reached an oral agreement, one party cannot unilaterally alter the terms of their agreement by subsequently sending a written form that purports to be conditioned on acceptance of the alterations.[11]

---

**6.** *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

**7.** *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99, 101–02 (1954); *Intercontinental Planning, Ltd. v. Daystrom Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582 (1969).

**8.** *Auten v. Auten, supra,* 308 N.Y. at 160, 124 N.E.2d at 102.

**9.** *See American Home Assur. Co. v. Employers Mut. of Wausau,* 77 A.D.2d 421, 425, 434 N.Y.S.

2d 7, 9 (1980), *aff'd,* 54 N.Y.2d 874, 444 N.Y.S.2d 917, 429 N.E.2d 424 (1981) (although no longer determinative, place of contracting is significant contact).

**10.** *See generally* 19 N.Y.Jur.2d *Conflict of Laws* § 35 at 614–15 (1982) (one goal of grouping of contacts approach to conflicts problems is to give effect to probable intent of the parties).

**11.** *See* Davenport, *How to Handle Sales of Goods: The Problem of Conflicting Purchase Orders and Acceptance and New Concepts in Con-*

Second, the "subject to" language of Eagle's printed form does not satisfy the "expressly made conditional" requirement.[12]

The treatment of the terms and conditions in Eagle's confirmation is governed by UCC § 2–207(2), which provides that:

The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

The parties here are merchants. Behrman did not limit acceptance to particular terms, and no objection to any of Eagle's acknowledgment form terms were made prior to the filing of this action. The terms, therefore, become part of the contract unless they materially alter it.

■ Although the question of when an additional term materially alters an agreement depends on the facts of each case,[13] some guidance is provided by the Official Comments to § 2–207. Official Comment 4 suggests that "materially alter" means clauses that would "result in surprise or hardship if incorporated without express awareness by the other party." Generally, disclaimers of warranties or limitations on liability materially alter an agreement.[14] The credible evidence, however, established that the only substantive warranty provision discussed by the parties was Eagle's replace or repair warranty for defects in material and workmanship. Eagle clearly intended that its own warranty apply, as indicated by including it in the acknowledgment form. Moreover, Syp testified credi-

bly that he and Behrman negotiated an extension of *Eagle's* warranty (Tr. 913–16), and Behrman did not contradict Syp's statements (Tr. 81–82, 258–60). There is also considerable indirect evidence that the parties based their agreement on Eagle's warranty term. Cable Holdings had previously received other Eagle equipment with the limited warranty (Tr. 839–41). SCC repeatedly acted in accordance with a replace or repair warranty by returning descramblers to Eagle and accepting repaired or new descramblers. Excluding additional or different warranties thus would not alter the negotiated oral contract between the parties. Nor can SCC or Cable Holdings claim surprise or hardship from it. Accordingly, we hold that the parties' contract included the limited Eagle warranty and disclaimer.

■ Interest provisions, such as contained in paragraph four of Eagle's terms and conditions, do not materially alter contracts and so are incorporated.[15] No surprise or hardship can be claimed to arise from charging interest on an unpaid bill. Similarly, freight charges generally are paid by the buyer, UCC § 2–308(a), and we hold that the freight charge provision in Eagle's acknowledgment also became part of the parties' contract.

■ Eagle's indemnity and attorney fee provisions, however, materially alter the contract and cannot become part of the contract. Unlike the warranty negotiations, there is no evidence that either Cable Holdings or SCC considered this provision. Nor did Eagle present any evidence that sellers customarily shift all risks for any dispute to the buyers. In view of the hardships that the provisions would cause, we conclude that they materially alter the con-

*tract Law,* in Uniform Commercial Code Handbook 72–73 (1964).

**12.** *CBS, Inc. v. Auburn Plastics, Inc.,* 67 A.D.2d 811, 413 N.Y.S.2d 50 (1979); 2 R. Anderson, *Uniform Commercial Code* § 2–207:11 at 277 (3d ed. 1982).

**13.** *See Luedtke Engineering Co. v. Indiana Limestone Co.,* 740 F.2d 598, 600 (7th Cir.1984); *John*

*Thallon & Co. v. M & N Meat Co.,* 396 F.Supp. 1239, 1243 (E.D.N.Y.1975).

**14.** *See* 2 R. Anderson, *Uniform Commercial Code, supra,* § 2–207:39 at 297.

**15.** *See Bausch & Lomb v. Monaco Electronics, Inc.,* 103 Misc.2d 966, 427 N.Y.S.2d 357 (1980), *aff'd,* 109 Misc.2d 365, 445 N.Y.S.2d 415 (App. Div.1981); UCC § 2–207 Official Comment 5.

tract,[16] that plaintiffs never consented to them, and, therefore, that they did not become part of the contract.

■ Eagle's notice clause, providing that claims made more than fifteen days after delivery are waived, also materially alters the agreement. The provision conflicts with the one and one-half year warranty agreed to by the parties and would result in unfair surprise and hardship to SCC. We hold that it did not become part of the agreement.

Eagle's other arguments for defining the agreement strictly by the acknowledgment terms are unpersuasive. Eagle cites *Roto-Lith, Ltd. v. F.P. Bartlett & Co.*,[17] an early UCC § 2-207 case holding that when a seller's acknowledgment and invoice stated that it was "subject to" terms that materially altered the buyer's order, the seller's forms should be treated as a counter-offer expressly conditioned on the buyer's acceptance of the different terms. The buyer was deemed to have accepted the counter-offer by receiving the goods and using them without objection.[18] The *Roto-Lith* approach has been criticized extensively for confounding the plain language of § 2-207 and subverting the purpose of the provision.[19] We decline to adopt it here.

Eagle's next argument that the acknowledgment terms constitute the agreement is based on the prior dealings between the parties using the same forms. The sole precedent relied on by Eagle, *Ernest J. Michel & Co. v. Anabasis Trade, Inc.*,[20] was premised on the parties' clear manifestations of intent to include the disputed term. The manifestations of mutual assent included the buyer's signing of the original contract, which contained the disputed term, and the buyer's objection and modification of another term in the original contract.[21] Except for the warranty term, no such manifestations of knowledge and assent to the terms in Eagle's form were offered in evidence.

■ Eagle also raises a statute of frauds objection to the oral agreement. The objection is without merit. The UCC expressly provides that, as between merchants, confirmatory writings satisfy the statute of frauds despite their statement of terms different from the parties' oral agreement.[22] UCC § 2-201(1) & (2). Eagle's inability to find legal authority for its position is unsurprising in light of *Marlene Industries Corp. v. Carnac Textiles, Inc.*,[23] which carefully explained the dis-

---

16. *See Charles J. King, Inc. v. Barge "LM-10,"* 518 F.Supp. 1117, 1120–21 (S.D.N.Y.1981); *Resch v. Greenlee Bros. & Co.*, 128 Wis.2d 237, 381 N.W.2d 590 (Ct.App.1985).

17. 297 F.2d 497 (1st Cir.1962).

18. *Id.* at 500.

19. *See Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 & n. 5 (6th Cir.1972); *Leonard Pevar Co. v. Evans Pdts. Co.*, 524 F.Supp. 546, 551–52 (D.Del.1981); *Ebasco Services, Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421, 436–38 (E.D.Pa.1973); *see also* Murray, *Intention over Terms: An Exploration of UCC 2-207 & New Section 60, Restatement of Contracts*, 37 Fordham L.Rev. 317, 329 (1969) ("The *Roto-Lith* case has been extensively noted in the law reviews and the consensus is clear that the case is not a reliable precedent.") (footnotes omitted).

20. 72 A.D.2d 715, 422 N.Y.S.2d 79 (1979), *aff'd*, 50 N.Y.2d 951, 431 N.Y.S.2d 459, 409 N.E.2d 933 (1980).

21. *Id.*

22. Section 2-201 (1) and (2) provide:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

23. 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239 (1978). *See also* UCC § 2-201 Official Comment 3.

tinction between the statute of frauds provision and § 2–207.

Accordingly, we find that a contract was formed by the parties' oral agreement plus the terms and conditions contained in Eagle's acknowledgment form, except for the notice, legal costs and indemnity clauses.

*Representations*

Plaintiffs allege that, in the course of negotiating the contract for the descramblers, Eagle represented that the descramblers were based on proven technology, were more secure from tampering than others on the market, would fail at a rate of less than four percent, and that Eagle would fully support the operation of the descramblers in the SCC system. Under UCC § 2–313(1)(a), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Accordingly, we must evaluate each alleged representation and determine whether it became part of the basis of the bargain.

■■■ With respect to the alleged representation that the descramblers would fail at a rate of less than four percent, we conclude that it was not made and could not have become part of the basis of the bargain. Behrman testified that during a visit to Syracuse in September 1982, Syp told him that Eagle expected the failure rate for the descramblers to be less than four percent (Tr. 75). Behrman also stated that Syp repeated the representation during a meeting with Richard Treibeck ("Treibeck"), president of Cable Holdings, held in New York City later that fall (Tr. 84). Treibeck did not testify. Syp denied making any statement with respect to an expected failure rate and stated that he had no basis for predicting a failure rate because SCC was the first customer for Eagle's addressable descramblers (Tr. 851).

Based on Syp's testimony and our assessment of the witnesses, we find that the representation was not made.

Even if the representation had been made, it could not have been part of the basis of the bargain. Plaintiff extracted substantial price concessions from Eagle because of the experimental nature of the addressable descrambling equipment at that time (Tr. 842–44). Any guarantee of performance at the prototype stage of production would have been contrary to the realities known to these experts in the then state of the art, and we find was not part of the bargain between Eagle and its first customer.[24]

The other representations, as will be discussed below, may have been made but were either satisfied or could not have been relied on by SCC.

*Performance*

■■■ We find that SCC's operation of the cable system, using Eagle descramblers through 1987, demonstrates that Eagle performed its part of the bargain. Eagle replaced or repaired descramblers returned to it as defective until this action was filed. Thereafter, Eagle remained ready, willing, and able to perform but was prevented from doing so by SCC's refusal to pay for descramblers that had been delivered and used in the system.

The extent of the initial problems reported by SCC—the beat on one channel and the potential for theft of services—were not established by SCC. Nonetheless, Eagle resolved both complaints to the satisfaction of SCC by repairing and later modifying the descramblers.

The significance of the other reported problems with the descramblers is difficult to evaluate. Behrman testified in generalities about problems with descramblers failing to descramble and scrambling channels that were not supposed to be scrambled. The only documentary evidence, the trouble call forms maintained and summarized by

---

**24.** *Cf. Stewart–Decatur Security Systems, Inc. v. Von Weise Gear Co.,* 517 F.2d 1136 (8th Cir. 1975) (rejection of equipment wrongful when buyer had previously approved prototype). *See generally* Special Project, *Article Two Warranties in Commercial Transactions,* 64 Cornell L.Rev. 30, 65, 172 (1978) (express warranties implicitly contradict agreement that seller provide experimental equipment and should not be enforced).

plaintiffs (PX 121), are of little help in ascertaining the cause of these problems. Although plaintiffs claim that some 11,600 trouble calls were descrambler-related over three and one-half years that Eagle descramblers were used, it is not clear that the trouble calls relate to any defect in the Eagle descramblers. The forms reflect telephone complaints by subscribers leading to service visits to the subscribers' homes. SCC service technicians would later report the result of the visits. After this action was filed, SCC personnel separated out trouble calls which they determined were descrambler-related. Many of the service calls, however, may reflect problems involving other equipment [25] or "false failures" in which the service technicians switched out descramblers even though no problem existed.

SCC's statements and conduct prior to filing this action indicate that it received what it had bargained for—state-of-the-art equipment that required a certain amount of debugging. In May 1983, after six months' experience with the Type 1 descramblers, Behrman appeared, at Eagle's request, at a cable equipment convention in Dallas, Texas (Tr. 167). Behrman spoke at a seminar on addressable equipment, describing the features he liked about the Eagle descramblers (Tr. 167–70, 182–83). He did not say anything negative about the Eagle descramblers (Tr. 167–70). Later that month, SCC was visited by representatives of a potential customer for Eagle equipment, Sammons Communications ("Sammons") (Tr. 183–86). Phillip Hix, the manager of the SCC systems, gave a favorable report of SCC's experiences with the Eagle equipment (DX IIII at 330–47, TTTT at 4–18). The Sammons representatives were favorably impressed from their visit, and Sammons ultimately purchased Eagle descramblers (DX LLL–3, TTTT at 18). Finally, at a September 9, 1983 trade show, Behrman told Eagle that the Type 2 descramblers appeared to work well and that Cable Holdings was considering using Ea-

gle descramblers in its other cable systems (Tr. 216).

Written communications by SCC and its co-plaintiffs in this action also indicate that the Type 2 descramblers performed satisfactorily. On September 30, 1983, two days after this action was filed, SCC, through its affiliate, Alexandria Realty Corp., sold an equity interest in its system to Energistics, Inc., expressly and unequivocally warranting that the cable equipment in the system was "in good working order, free of all inherent defects and suitable for its intended purpose" (DX VV–2). Later communications from the licensees indicate satisfaction with the performance of the Eagle descramblers. A report, dated December 28, 1983, states "the system continues to operate well" (DX BBB–3), and a January 7, 1985 report states "operation of the system continues smoothly" (DX BBB–4).

Similarly, SCC's communications with its franchisor, the Parish of St. Charles, confirm this evidence of acceptable, if not trouble-free, performance. SCC reported no complaints regarding descramblers or cable problems that relate to descramblers in the required quarterly summaries of customer complaints (DX OO, PP). Nor did SCC have any complaints that could be tied to defective descramblers in the complaint file it was required to maintain (Tr. 228, 235, 720–21). SCC's records for service discontinuance indicate only ten instances of disconnects due to "poor service" prior to this action (Tr. 235; DX GGGGG, GGGGG–1, GGGGG–2). Finally, SCC produced no record of credit given to subscribers for lost service stemming from descrambler problems (Tr. 728).

The testimony by plaintiffs' expert regarding the results of his testing of the Type 2 descramblers in September 1985 and February 1986 (PX 115, 119) does not convince us of any failure to perform by Eagle. The tests occurred more than two

**25.** Cable Holdings sued at least one other manufacturer of cable equipment, alleging that equipment supplied to SCC was defective (Tr. 270–74, 728–33; DX CCC). SCC also returned convert-

ers to Standard Components, claiming that they were defective (Tr. 276–80; DX EE–1, EE–2, EE–3).

years after delivery of the Type 2 descramblers—well after the expiration of any warranty. The expert's lack of knowledge concerning the prior use and storage of the Type 2 descramblers (Tr. 363–64), added to the fact that SCC selected which descramblers were to be tested (Tr. 395–98), undercut the credibility of his data. The second round of testing suffered from the same flaws, particularly as to the expert's conclusions about the intermittent nature of the descrambler failures (Tr. 421–55). The expert's assertion that the high failure rate found in his testing reflected an inherent defect was unconvincing because the expert admittedly had not attempted to diagnose the source of the failures (Tr. 393–94). In sum, the expert's conclusions concerning the Type 2 units appear to have been based on inadequate data, faulty assumptions, and a disregard for the ongoing operation of the SCC system using Eagle descramblers.

Although testing by Eagle's expert and Eagle personnel confirmed the failure of a substantial number of Eagle descramblers, the sum total of working descramblers in the SCC system, plus those which had passed testing in SCC's inventory, met Eagle's contractual obligation to supply 5,500 descramblers and replace or repair defective descramblers. Only SCC's refusal to pay for descramblers which had been delivered and used to operate its cable system prevented Eagle from continuing to supply and support the descrambling system.

Accordingly, we conclude that plaintiffs have failed to prove breach of warranty and that Eagle is entitled to recover the unpaid balance of the purchase price of the descramblers.

**26.** *See Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

**27.** *See White v. Guarente,* 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977).

**28.** UCC § 2–313(2) provides, in pertinent part, that "an affirmation of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not

*Fraud and Negligent Misrepresentation*

■ The conclusions above dispose of plaintiffs' other claims as well. An untrue statement is required as an element of both fraud[26] and negligent misrepresentation.[27] We find that Eagle made no representation of failure rate and that the representations concerning descrambler security and Eagle's willingness to support its product were true. The representation that the descramblers were "based on proven technology" was not shown to have been made and, in any case, was too vague to have been relied on.[28] Accordingly, we find for defendant Eagle on these claims as well.

*Liability on Eagle's Counterclaims*

■ We find that Cable Holdings acted as the agent for an undisclosed principal in purchasing Eagle descramblers for SCC. Behrman and Treibeck negotiated a substantially lower price for Eagle's descramblers based on their representations that Cable Holdings would make further purchases for other cable systems (Tr. 239–44; DX SSSS at 61–62). Eagle billed Cable Holdings for the orders (DX L, N, O, P, Q, R, S), indicating that it was relying on Cable Holdings' credit.[29] Cable Holdings never objected to being billed for the descramblers and other equipment, and the initial payments to Eagle of $12,547.00 in December 1982 and $50,000.00 in May 1983 were made from an omnibus account maintained by Cable Holdings (Tr. 286, 698–702; PX 3, 79). Moreover, Syp testified that Behrman, whom Syp knew to be the chief engineer of Cable Holdings (Tr. 837), never disclosed that he was acting on behalf of SCC (Tr. 850). Regardless of what Eagle later learned, this evidence convinces us that at the time of contracting Eagle did not know that Cable Holdings was acting

create warranty." Under the circumstances, particularly the experimental nature of the descramblers, we find that SCC would have understood the statement to be mere puffing.

**29.** *See Propstra v. Dyer,* 189 F.2d 810, 812 (2d Cir.1951); *Rothschild Sunsystems, Inc. v. Pawlus,* 129 A.D.2d 933, 514 N.Y.S.2d 572 (1987); *Shoenthal v. Bernstein,* 276 A.D. 200, 93 N.Y.S. 2d 187, *appeal dismissed,* 276 A.D. 831, 93 N.Y.S. 2d 908 (1949).

as an agent for SCC.[30]

Under New York law, an agent who enters into an agreement on behalf of an undisclosed principal is jointly and severally liable on the agreement.[31] Accordingly, we hold SCC and Cable Holdings jointly and severally liable on Eagle's counterclaims. Eagle may recover the following: (1) the balance of the contract price for 5,500 descramblers and other equipment; (2) interest at the contract rate of eighteen percent a year, dating from delivery or invoice; (3) the value of the descramblers that were not returned; and (4) freight charges. SCC and Cable Holdings may offset the savings to Eagle from not having to repair or replace descramblers to the extent that they can show that there were fewer than 5,500 operable descramblers during the warranty period.

Although Eagle makes no contractual claims for payment against the licensees, Eagle seeks to hold them liable for conversion. New York courts hold that "an action for conversion cannot be validly maintained where damages are merely being sought for breach of contract." [32] Eagle, therefore, may not transform its contract claims against Cable Holdings and SCC into conversion claims against the licensees. Accordingly, Eagle's conversion counterclaim is dismissed, and Alexandria Realty Corp., Energistics, Inc., Delta Telecommunications, and Robert Broz are dismissed from the case.

## CONCLUSION

The foregoing opinion constitutes our findings of fact and conclusions of law, in accordance with Rule 52(a), Fed.R.Civ.P.

In summary:

(1) All claims asserted against Eagle by SCC, Cable Holdings, Alexandria Realty Corp., Energistics, Inc., Delta Telecommunications, and Robert Broz are dismissed on the merits.

(2) Eagle's conversion counterclaim is dismissed and Alexandria Realty Corp., Energistics, Inc., Delta Telecommunications, and Robert Broz are dismissed as parties.

(3) SCC and Cable Holdings are jointly and severally liable on Eagle's other counterclaims to the extent indicated herein.

If the remaining parties are able to agree on the amount of damages recoverable by Eagle, they may, within twenty (20) days, submit for our approval a form of final judgment for a sum certain; otherwise, the parties are directed to settle a partial judgment on the issue of liability, not inconsistent with this opinion, within twenty (20) days, and thereafter the court will set a time for a trial to determine the amount of damages.

**30.** An agent must disclose the agency and the identity of the principal at the time of contracting to assert agency as a defense. *See Rothschild Sunsystems, Inc. v. Pawlus, supra; Tarolli Lumber Co. v. Andreassi,* 59 A.D.2d 1011, 399 N.Y.S.2d 739 (1977); *Van Rossem v. Penney Travel Service, Inc.,* 128 Misc.2d 50, 488 N.Y.S.2d 595 (1985).

**31.** 3 N.Y.Jur.2d *Agency & Independent Contractors* § 303 (1980).

**32.** *Fraser v. Doubleday & Co.,* 587 F.Supp. 1284, 1288 (S.D.N.Y.1984) (quoting *Peters Griffin Woodward, Inc. v. WCSC, Inc.,* 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (1982)).