39 F.3d 412
 THALLE CONSTRUCTION CO., INC.,
Plaintiff-Appellant-Cross-Appellee, Counter-Defendant,
v.
The WHITING-TURNER CONTRACTING COMPANY, INC.,
Defendant-Appellee-Cross-Appellant, Counter-Claimant.
 Nos. 234, 369, Dockets 94-7108L, 94-7126XAP.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 7, 1994.
Decided Nov. 10, 1994.
 
 James S. Morris, O'Connor, Morris & Jones, Greenwich, CT (Christopher W. Caldwell, of counsel), for plaintiff-appellant-cross-appellee, counter-defendant.
 Herman M. Braude, Braude & Margulies, Washington, DC, Judith F. Herman, Levy & Tolman, New York City (William M. Huddles, Braude & Margulies, Baltimore, MD, of counsel), for defendant-appellee-cross-appellant, counter-claimant.
 Before: MESKILL, MAHONEY and WALKER, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 This diversity action is brought by Thalle Construction Company ("Thalle"), a citizen of New York and a subcontractor on a project to build an office complex for IBM, against the general contractor Whiting-Turner Contracting Company ("Whiting-Turner"), a citizen of Maryland, to recover damages for delays suffered by Thalle. Plaintiff appeals from a judgment of the United States District Court for the Southern District of New York (Gerard L. Goettel, District Judge ) finding Whiting-Turner liable for three months of delay damages totaling approximately $600,000 and holding Thalle liable for $339,147 in counterclaims. Plaintiff challenges (1) the district court's findings of fact as to the length of delay; (2) the measure of damages for its delay; and (3) Thalle's liability for defendant's counterclaims. Whiting-Turner cross-appeals, contending that 1) the district court erred in holding Whiting-Turner liable for any delay; 2) the measure of damages was inaccurate; and 3) plaintiff waived its claims.
 
 
 2
 For the reasons that follow, we reverse the judgment below in part and remand.
 
 BACKGROUND
 
 3
 In March, 1986, the Whiting-Turner Contracting Company entered into a general contract with IBM to construct IBM's "Customer Executive Education Center." The six-building, $68.9 million complex was designed to house IBM's most important customers while they received demonstrations of and training in the company's newest products. Three months later, Thalle signed a subcontract with Whiting-Turner in which Thalle agreed to perform the site work on the project for slightly over $5 million. The site work entailed several distinct tasks, including clearing, excavation, paving, and installation of site utilities and drainage systems.
 
 
 4
 When Thalle first submitted its bid, the entire project was scheduled to begin in October, 1985 and conclude by December, 1987, a total of 27 months. If selected, Thalle would be the first subcontractor to arrive at the site. In November, 1985, however, IBM informed Whiting-Turner, and Whiting-Turner in turn informed Thalle, that construction would not begin until at least the spring of 1986. Thalle agreed to maintain its current bid until March 1, 1986. Thalle's bid was eventually accepted, and Thalle arrived at the site to begin its work on April 1.
 
 
 5
 Thalle's work did not proceed as planned. From nearly its first day, the project was fraught with delays. Perhaps most seriously, Whiting-Turner experienced a number of problems with Prim-Mar, its concrete subcontractor. After beginning work in June, 1986, Prim-Mar refused to execute its subcontract and operated with a reduced workforce, demanding that Whiting-Turner raise the subcontract price to compensate for supposed delays and increased costs. Even though Whiting-Turner eventually paid Prim-Mar an additional $643,000 beyond its subcontract price, Prim-Mar failed to meet the deadlines listed in the concrete subcontract. Prim-Mar was also unable to meet a second, more relaxed schedule. Whiting-Turner eventually terminated Prim-Mar after it abandoned the project in February, 1988. The delays caused by Prim-Mar's intransigence slowed some of Thalle's excavation and backfilling, which was dependent upon the completion of Prim-Mar's concrete work.
 
 
 6
 Other project participants also delayed Thalle's work. IBM, the site owner, failed to obtain permits from the State of New York to commence work along two roads. The electrical and waterproofing subcontractors also performed more slowly than required. Because of these problems and Whiting-Turner's difficulties in coordinating the work of the various subcontractors, several of the project areas were not released to Thalle when needed.
 
 
 7
 Thalle also suffered numerous setbacks itself. Thalle failed to perform "sheeting and shoring" in one location, prompting a design adjustment and at least a mild delay. Thalle also experienced labor union unrest leading to a one-day strike and a "sick out" of up to one and a half days. To add to its problems, Thalle encountered ground water near one dam and rock at various building sites, both unanticipated. These obstructions required design changes and slowed Thalle's progress.
 
 
 8
 As a result of the myriad delays, Thalle's activities took substantially longer than expected. Bulk excavation and preliminary backfill, scheduled to be essentially completed by the end of 1986, stretched through the winter months of 1987. Additional backfill work was then pushed into the spring. Although Thalle's major responsibilities were originally to end by May 31, 1987, Thalle worked steadily through the end of 1987. Thalle did not leave the site until August 1988, returning in October and November to complete final tasks. Because of these delays, Thalle refused to release Whiting-Turner from liability on the subcontract. Whiting-Turner initially held up payment of the balance remaining on the subcontract pending that release, but finally settled its account with Thalle in July, 1989 despite Thalle's refusal. Whiting-Turner then signed a general release in favor of IBM in October of 1990.
 
 
 9
 Thalle filed suit against Whiting-Turner in February, 1991. Thalle claimed, among other allegations, that the delays it suffered resulted in over $4 million of additional costs. It arrived at this figure using the "total cost" approach, which measures the total cost of the subcontract, including profit and office overhead, and subtracts amounts received by the subcontractor. Whiting-Turner counterclaimed, asking for damages for delays prompted by Thalle and indemnification for damage that Thalle caused to adjacent property through its blasting and failure to control erosion, as well as for stump burial fees Whiting-Turner paid on Thalle's behalf.
 
 
 10
 Following a non-jury trial, the district court found that Thalle suffered three months of delay due to Whiting-Turner's poor coordination of its subcontractors. The court rejected Thalle's "total cost" measure of damages, and instead held Whiting-Turner liable for three months worth of additional revenue, or $600,000. The court also allowed counterclaims in the amount of $339,147. Both parties appealed.DISCUSSION
 
 I. The District Court's Findings of Fact
 
 11
 Both parties contest the district court's findings of fact regarding the length and cause of delays suffered by Thalle. Thalle argues that it experienced far more than three months of delay. It offers two prongs to this argument: First, it challenges Judge Goettel's conclusion that Thalle either contributed to or "drifted along with" six months of delay in 1986. Second, Thalle takes issue with the district court's finding that Thalle's duties continued through the end of the project. Because its subcontract was to be fully completed on May 31, 1987, Thalle contends, the amount of delay should be measured from that date. Whiting-Turner argues that Thalle itself delayed the project by six months and should thus be held liable.
 
 
 12
 Amid this welter of contentions, all presented to the court below, we are guided by the principle that a district court's findings of fact should not be set aside on appeal unless they are "clearly erroneous." Fed.R.Civ.P. 52(a). This stringent standard is only met if " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Our task is not to reweigh the evidence, but merely to determine whether there is plausible support for the district court's conclusions. Given the evidence in support of the positions both sides advance, we decline to upset the district court's findings.
 
 A. The Length and Source of Delays in 1986
 
 13
 Thalle points to several documents which suggest that it did indeed suffer injury from the months of delay in 1986. Most telling are two different exchanges of correspondence between Thalle and Whiting-Turner. On December 22, 1986, Thalle sent Whiting-Turner a letter informing the contractor that Thalle's work was being forced into the winter months. The letter stated that "if not for the delays in starting and production of your concrete subcontractor, our work would be basically complete as of this date." In its January 7, 1987 response, Whiting-Turner, instead of disputing this conclusion, agreed to pay a portion of Thalle's increased costs incurred from working during the winter. This concession suggests that both parties recognized the additional burden that Prim-Mar's behavior imposed on Thalle.
 
 
 14
 The second exchange of letters occurred in August of 1987. Previously, Whiting-Turner had written to Thalle complaining of "Thalle's contribution to past schedule delays and refusal to perform work as directed." Thalle's letter of August 3 responded to these "unfounded allegations" with a detailed list of the delays it had experienced and their causes. Whiting-Turner's reply adopted a softer tone than its last, emphasizing the tentative nature of the project schedule and assuring Thalle that the contractor "appreciate[s] your continued efforts ... and will endeavor to seek an equitable resolution of your complaints." The conciliatory nature of this response lends credence to Thalle's position that it was not at fault for the delays.
 
 
 15
 On the other hand, there is ample evidence supporting the district court's findings. Two employees of Whiting-Turner, its senior project manager and project superintendent, testified that Thalle's deficient performance delayed the schedule by several months. Whiting-Turner also introduced minutes of its progress meetings which, although far from clear, appear to indicate that Thalle had fallen behind in its work. More importantly, Thalle admits that it decided not to use sheeting and shoring for one building in contravention of Whiting-Turner's instructions, prompting a holdup of several weeks as the contractor verified the feasibility of this change. Finally, Whiting-Turner did mention problems with Thalle in correspondence; on March 3, 1987, Whiting-Turner stated that "[i]n deference to renewed cooperation and [e]ffective scheduling we will not enumerate former Thalle-related difficulties in this letter." In light of this letter, it is possible that Whiting-Turner's conciliatory tone in other correspondence was more an effort at diplomacy than an admission of fault.
 
 
 16
 Given the support for both sides' assertions, we cannot conclude that the findings of the district court on this issue were clearly erroneous. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574, 105 S.Ct. at 1511. Here, a rational factfinder could have credited evidence either that Thalle suffered from the delays caused by Prim-Mar in 1986 or that Thalle drifted along with them.
 
 
 17
 We note that the nature of this case renders it particularly unsuitable for appellate factual review. At issue are questions of the proper order of performance in a complex construction contract. For example, Thalle asserts that it could not begin clearing the area until Whiting-Turner surveyed. Whiting-Turner, in contrast, contends that Thalle delayed the surveyors by failing to clear the site. A similar dispute exists as to whether Thalle's excavation should have preceded or followed Prim-Mar's concrete work. Unlike the district court, this court has not heard the expert testimony necessary to resolve such questions. Accordingly, on the record before us, we find no reason to disturb the district court's finding that Thalle only suffered three months of delay.
 
 
 18
 We also note that this determination will be of less consequence on remand. As explained below, Whiting-Turner is liable for the proportion of the costs sustained by Thalle attributable to the delay within Whiting-Turner's direction or control. It is this cost measure, rather than the actual length of the delays faced by Thalle, which determines Thalle's recovery. Thus, while the district court's finding that Thalle suffered three months of delay bears on Whiting-Turner's liability, it does not directly determine the amount of damages.
 
 
 19
 We also reject Whiting-Turner's factual challenge to the district court's finding that no delay damages to Whiting-Turner were attributable to Thalle. Whiting-Turner argues that it should receive $643,000 as damages on its counterclaim for six months of delay that Thalle caused in 1986. The district court, however, did not find that Thalle bore the responsibility for either Prim-Mar's delays or the increase in Prim-Mar's subcontract price. Rather, it found that Prim-Mar's refusal to commit necessary manpower virtually from the beginning of the project was the source of the problem. Whiting-Turner has not demonstrated that this conclusion was clearly erroneous, and therefore its claim for delay damages from Thalle cannot prevail.
 
 B. The Subcontract Completion Date
 
 20
 Thalle also argues that the subcontract should have ended on May 31, 1987, and that the amount of delay should be measured from that date. The district court concluded that this date, which appeared on Attachment D of Thalle's subcontract, did not take into account a number of minor tasks such as final grading and erosion control. It therefore refused to fix a firm date for the completion of the subcontract, instead suggesting that it extended through the latter stages of the project. We decline to overturn this finding.
 
 
 21
 Thalle's argument centers around a bar chart made by Whiting-Turner which showed the completion date for topsoiling as May 31, 1987. Thalle then highlights deposition testimony of a Whiting-Turner project engineer in another case indicating that topsoiling was Thalle's final assignment. Whiting-Turner, on the other hand, argues that the bar chart covered only major tasks. The subcontract, in contrast, specified that Thalle's responsibilities included erosion and sediment control "as required until permanent seeding," minor tasks which continued through the latter stages of the project. Whiting-Turner's correspondence with Thalle supports this position. The district court apparently credited Whiting-Turner's version, and Thalle has not persuaded us that this finding was clearly erroneous.
 
 
 22
 We note that the district court opinion does present an apparent minor inconsistency. After concluding that the subcontract extended beyond May 31, 1987, the district court then computes interest with reference to "May 31, 1987, the subcontract completion date." On remand, the district court should feel free to clarify its use of the two terms. Once again, however, because damages are determined by the costs attributable to delay rather than the length of delay, the inconsistency will likely be immaterial.
 
 II. The Appropriate Measure of Damages
 
 23
 In computing damages, the district court rejected the "total cost" method urged by Thalle on the ground that Thalle was unable to produce and verify the accuracy of its bid estimates. Instead, the court divided the original contract price by the estimated length of the project to arrive at the estimated revenue per month, which it calculated to be $200,000. The court then multiplied that figure by the three months of delay that Whiting-Turner caused to Thalle and awarded Thalle $600,000 in delay damages. Because New York law requires that delay damages be calculated using a cost-based method, we reverse the district court's assessment of damages and remand.
 
 
 24
 A subcontractor's damages for delay in construction cases are measured as a general matter by "the extent to which its costs were increased by the improper conduct, and its recovery will be limited to damages actually sustained." Peter Scalamandre & Sons, Inc. v. Village Dock, Inc., 187 A.D.2d 496, 589 N.Y.S.2d 191, 191 (1992). The most precise method of calculating these damages involves tracing particular cost items to the delay caused by the defendant. A related method measures damages as the difference between total costs when delays are taken into account and total costs absent delays.
 
 
 25
 Often, however, these two methods prove prohibitively difficult or speculative. In these instances, courts estimate the extra costs occasioned by the defendant's delays by using a proxy for plaintiff's costs absent delays. See Berley Indus., Inc. v. City of New York, 45 N.Y.2d 683, 687, 412 N.Y.S.2d 589, 591, 385 N.E.2d 281, 283 (1978). The most common method of estimation in this context is the "total cost" method. Najjar Indus., Inc. v. City of New York, 87 A.D.2d 329, 451 N.Y.S.2d 410, 413-14 (1982); see, e.g., Whitmyer Bros., Inc. v. State, 47 N.Y.2d 960, 962, 419 N.Y.S.2d 954, 955, 393 N.E.2d 1027, 1028 (1979); Peter Scalamandre, 589 N.Y.S.2d at 191.
 
 
 26
 We described the correct application of the total cost method under New York law in Wolff & Munier, Inc. v. Whiting-Turner Contracting Company, 946 F.2d 1003 (2d Cir.1991), a case which involved the same project and defendant as this one. The district court must first determine total delay damages, which are "the difference between the contract price ... and ... total job costs, including overhead and profits, if applicable." Id. at 1010. Then, the court must "apportion delay damages according to each party's responsibility for them." Id.
 
 
 27
 Thalle's inability to produce its bid estimate does not preclude use of the total cost method. Although some courts require that plaintiff provide an accurate bid estimate in order to utilize the total cost method, see John F. Harkins Co. v. School Dist., 313 Pa.Super. 425, 460 A.2d 260, 263 (1983); Boyajian v. United States, 423 F.2d 1231, 1242-43, 191 Ct.Cl. 233 (1970), New York courts have rejected bid figures in damages computation with near unanimity. Novak & Co. v. Facilities Dev. Corp., 116 A.D.2d 891, 498 N.Y.S.2d 492, 494 (1986). In Fehlhaber Corp. v. State, 69 A.D.2d 362, 419 N.Y.S.2d 773 (App.Div.1979), the court specifically sanctioned a measure of damages that computed total costs "without regard to bid figures." Id., 419 N.Y.S.2d at 775. As long as the contract price is available, as it is in this case, the total cost approach is feasible.
 
 
 28
 The district court rejected this approach partly because it viewed with suspicion several cost items submitted by Thalle. First, the court commented that Thalle included overhead and profit even though it did not prove that these items were contemplated in its original bid. Second, the court faulted Thalle for attributing full costs to periods when employees and equipment were idle. The court noted critically that Thalle claimed over $1.6 million in damages for a period during which it was to receive only $368,000 in revenue.
 
 
 29
 New York cases indicate, however, that delay damages frequently include an allowance for profit and overhead, including home office overhead. See Whitmyer Bros., 47 N.Y.2d at 962, 419 N.Y.S.2d at 955, 393 N.E.2d at 1028. It can be assumed that a construction subcontract includes a markup for profit; as a result, courts typically treat foregone profit as a cost incurred as a result of delays. See S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F.Supp. 1014, 1031-33 (S.D.N.Y.1984) (awarding damages for "the overhead and profit margin 'lost' on the job due to defendant's delays"), aff'd, 762 F.2d 990 (2d Cir.1985). As to overhead, courts have allowed recovery if the plaintiff can show that the delays required overhead costs above what would have been incurred otherwise. See, e.g., id. at 1033 ("Evidence that the delay precipitated engineering or design problems that called for central staff consideration will suffice to satisfy the burden of proving an increase in overhead."); Fehlhaber, 419 N.Y.S.2d at 776. This test merely restates the general rule applicable to all cost items that "speculation will not be indulged and damages will be limited to damages actually proven." Id. at 777.
 
 
 30
 Yet it should be emphasized that costs should not be excluded solely because they greatly exceed revenues for a particular period. Thalle may well have incurred substantial costs if it was forced to keep its employees and equipment ready while waiting for the opportunity to complete its work, regardless of how little work remained. As long as the included items accurately represent costs that were actually increased by the delays Thalle suffered, they are compensable.
 
 
 31
 The second step in the total cost method involves apportioning damages according to the relative fault of Whiting-Turner. A general contractor (sometimes called a "prime contractor") is only responsible for delays "caused by some agency or circumstance under the prime contractor's direction or control." Triangle Sheet Metal Works, Inc. v. James H. Merritt & Co., 79 N.Y.2d 801, 802, 580 N.Y.S.2d 171, 172, 588 N.E.2d 69, 70 (1991). Pursuant to this principle, the court should determine the proportion of the delay attributable to Whiting-Turner's acts or omissions and assess plaintiff's damages accordingly. See, e.g., Fehlhaber, 419 N.Y.S.2d at 778 (apportioning 75% of damages to the defendant where 25% of the fault for the delay was attributable to the plaintiff).
 
 
 32
 This calculus should not omit consideration of the delays principally attributable to IBM. New York cases do not explicitly state that a general contractor is liable for delays most directly caused by the site's owner. Yet courts have applied the "direction or control" test to delays stemming from a host of causes, including owners' actions. In Port Chester Electrical Constr. Corp. v. HBE Corp., 978 F.2d 820 (2d Cir.1992), for example, this court examined delays to a subcontractor which included delays caused by the owner, other subcontractors, other prime contractors, and the weather. See id. at 822. While cautioning that a contractor is not wholly responsible for delays caused by others, we remanded the case to the district court to determine "which, if any, of the alleged delays were attributable in whole or in part" to the defendant. Id.; cf. Quaker-Empire Constr. Co. v. D.A. Collins Constr. Co., 88 A.D.2d 1043, 452 N.Y.S.2d 692, 694 (1982) ("[W]hether the [owner] or other third parties may have contributed to some of the delay" does not relieve the contractor from liability.).
 
 
 33
 We see no reason why IBM's actions should be treated any differently than other sources of delay. The district court's findings merely state that the failure of IBM to obtain permits for road construction delayed Thalle's work on these areas. They do not explain the reasons for this delay or Whiting-Turner's role, if any, in bringing them about. If, for example, Whiting-Turner had a duty to inform IBM about the need for the permits or the timing for their acquisition and failed to do so in an accurate or timely fashion, Whiting-Turner might bear some responsibility for the resulting delays to Thalle.
 
 
 34
 We recognize that the tasks of determining the amount of costs attributable to the delays and apportioning fault are not without some difficulty in the context of this project. While Thalle has the burden to show the extent to which Whiting-Turner's wrongdoing increased its costs, see Wolff & Munier, 946 F.2d at 1010, its claim should not be defeated solely because the complexity of the project and the vast number of delays make determination of damages difficult. " 'A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain.' " Najjar Indus., 451 N.Y.S.2d at 414-15 (App.Div.1982) (quoting Wakeman v. The Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886)); see also Wolff & Munier, 946 F.2d at 1010 ("[A] party is not to be denied damages when they are necessarily uncertain."). The total cost approach, however onerous it may be to apply in this case, is nonetheless required under New York law.
 
 III. Other Challenges
 
 35
 The parties raise several additional challenges. Thalle contends that the district court erred in allowing Whiting-Turner's counterclaims. Whiting-Turner argues that Thalle waived its claims for delay damages by failing to notify Whiting-Turner of these claims in a timely manner. We have considered these challenges and find them to be without merit.
 
 CONCLUSION
 
 36
 Accordingly, we reverse the decision of the district court and remand for proceedings consistent with this opinion.