**AEL INDUSTRIES, INC.**

v.

**LORAL FAIRCHILD CORP.**

Civ. A. No. 94–2176.

United States District Court,
E.D. Pennsylvania.

Jan. 26, 1995.

---

John J. Monsees, Blank, Rome, Comisky & McCauley, Robert G. Fryling, Saul, Ewing, Remick & Saul, John W. Fowler, Jr., Blank, Rome, Comisky & McCauley, Philadelphia, PA, for plaintiff AEL Industries, Inc.

Frank M. Rapoport, Pepper, Hamilton and Scheetz, Philadelphia, PA, for defendant Loral Fairchild Corp.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

After a bench trial of this case on January 10–12, 1995, and after considering the testimony of the witnesses, the admitted exhibits and the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.[1]

### *Findings of Fact*

#### A. *The Request For Proposals*

1. On December 29, 1988, defendant Loral Fairchild Corporation ("Loral") distributed a request for proposals for a subcontract on a prime contract it had entered into with the United States Air Force ("USAF"). The prime contract called for the manufacture and installation of a long-range reconnaissance camera, known as the EO–LOROPS camera, in USAF RF–4C aircraft. Loral sought a subcontractor to design and build a system to mount the cameras within the aircraft. The mounting system components are referred to as the "Group A Kit." The camera itself, together with related equipment, is referred to as the "Group B Kit."

2. The prime contract required Loral to perform a structural analysis of the impact of the camera and mounting equipment on the airplane. Loral incorporated this requirement into its request for subcontracting proposals, requiring that the subcontractor perform the structural analysis called for by the USAF in the prime contract.

3. Paragraph 4.3.2.10 of Loral's Statement of Work[2] (the "SOW") incorporated the requirement that the subcontractor analyze the impact of the Group A and Group B equipment on the airplane by performing Durability and Damage Tolerance Analyses ("DADTA"):

> The installation of the Airborne Equipment shall not alter the Structural Integrity of the aircraft . . . The subcontractor shall perform and submit the Durability Analysis Reports and the Damage Tolerance Analysis Reports [in accordance with] CDRL A039 and A040.

4. The phrase "Airborne Equipment" in paragraph 4.3.2.10 refers to both the Group A and the Group B equipment.

---

1. These Findings of Fact and Conclusions of Law also encompass a ruling on defendant's Motion to Exclude Evidence. See Conclusions of Law ¶¶ 14–20.

2. The Statement of Work is a portion of the request for proposals which details the tasks that the subcontractor would be required to perform.

5. The "CDRL A039 and A040" referred to in paragraph 4.3.2.10 correspond to two numbered items on a Contract Data Requirements List ("CDRL") incorporated in the SOW; these CDRLs describe the tasks to be performed by the subcontractor in fulfillment of the DADTA. The Data Item Description attached to CDRL A039, for example, provides as follows:

The contractor shall prepare a Durability Analysis Report which shall identify those areas of the airframe structure which could be susceptible to fatigue, corrosion, or other crack initiation mechanisms.

6. DADTA is defined and codified in United States Department of Defense contract standards, specifically those incorporated in MIL–STD 1530A, entitled "Aircraft Structural Integrity."

7. Paragraph 4.1.1 of the SOW stated that "Group A equipment must meet all the MIL–STDs, DOD–STDs and McDonnell–Douglas Process Specifications stated in this [Statement of Work]."

8. Loral's request for proposals required that the subcontractor take steps to obtain any engineering data needed to complete the subcontract from McDonnell Douglas, the RF–4C's manufacturer. Paragraph 10.2 of the Statement of Work provided as follows:

The Group A Kit subcontractor shall establish an Associate Contractor Agreement with McDonnell Douglas in order to obtain any required data necessary to perform this contract.

### B. *AEL Industries, Inc.'s Proposal To Loral*

9. On February 23, 1989, plaintiff AEL Industries, Inc. ("AEL") submitted a proposal to perform the subcontract work solicited by Loral. The proposal was divided into three parts: a management proposal, a technical proposal, and a pricing proposal. The technical proposal incorporated the SOW by describing, in numbered paragraphs corresponding to paragraphs in the SOW, each of the tasks AEL would perform under the proposed subcontract.

10. AEL proposed modifications to some CDRLs contained in Loral's SOW, but did not propose modifications to CDRLs A039 or A040. The modifications were proposed by AEL as the result of a "sanitizing" process performed by AEL's proposal team. The purpose of the "sanitizing" process was to remove from the SOW a number of data analyses contained in the prime contract which AEL did not believe were required in the proposed subcontract. For example, AEL's proposal describes CDRLs B001 and A012 as "not required" for the subcontract, and CDRL B002 as limited to "source data" only. AEL made a careful review of the CDRL requirements in Loral's SOW and concluded that CDRLs A039 and A040, applied to the airborne equipment (both Group A and Group B) as installed on the aircraft, would be required.

11. In submitting its proposal, AEL informed Loral that "[t]he AEL proposal is fully responsive to the [Loral] requirements, and no deviations or exceptions are taken or requested." No deviations or exceptions relating to DADTA or to CDRLs A039 or A040 were set forth in AEL's proposal.

### C. *Post–Proposal Discussions*

12. Between the submission of its bid proposal to Loral in February 1989 and the subcontract award in July 1989, AEL corresponded with and met with Loral on numerous occasions to negotiate various terms of the SOW and other aspects of Loral's solicitation. At no time during this correspondence or during these meetings was paragraph 4.3.2.10 of the SOW discussed.

13. On June 28, 1989, AEL participated in a Preliminary Design Review held between the USAF and Loral. The purpose of the review was to discuss the status of Loral's efforts on the EO–LOROPS prime contract. Paragraph 4.3.2.10 of the SOW was not addressed during the Preliminary Design Review. AEL's written presentation materials indicated an intent to comply with paragraph 4.3.2.10.

### D. *Offer And Acceptance Of The Contract*

14. On July 14, 1989, Loral awarded the subcontract (the "contract") to AEL. This contract incorporated a SOW. Paragraph 4.3.2.10 of the SOW, requiring AEL to perform the DADTA on the RF–4C aircraft, was

identical to paragraph 4.3.2.10 of Loral's solicitation and of AEL's proposal. Similarly, paragraphs 4.1.1 and 10.2, referenced above, were incorporated in the contract in a form identical to that in Loral's solicitation and AEL's proposal.

15. On August 2, 1989, AEL accepted the contract, subject to conditions not relevant to the present action. AEL did not condition its acceptance on a deletion or modification of the DADTA requirement set forth in paragraph 4.3.2.10 of the SOW incorporated into the contract.

E. *The Post–Contract Communications*

16. On August 28, 1989, AEL wrote Loral to report that it had further reviewed the terms of the SOW accompanying the subcontract offer. AEL "reserve[d] the right to comment" on certain provisions of the SOW. AEL did not seek to reserve its right to comment, or otherwise refer to, the DADTA requirement set forth in paragraph 4.3.2.10 of the SOW incorporated into the contract.

17. On August 7, 1989, AEL provided a document titled "Equipment Schedule" to Loral. The schedule listed the tasks required by the contract and provided a completion date for each task. The schedule contained references to both CDRL A039 and CDRL A040, including a proposed completion date for each CDRL. The schedule did not purport to modify or limit the DADTA requirement set forth in paragraph 4.3.2.10 of the SOW incorporated into the contract.

18. On September 14–15, 1989, AEL participated in a Preliminary Design Review with Loral. The purpose of the review was to discuss the status of AEL's efforts on the subcontract. AEL did not dispute its obligations under paragraph 4.3.2.10 of the SOW during the Preliminary Design Review. AEL's written presentation materials indicate that AEL intended to comply with paragraph 4.3.2.10.

F. *AEL's Partial Repudiation Of The Contract*

19. AEL subsequently determined that it had "grossly underestimated the cost" of fulfilling its obligations under paragraph 4.3.2.10 of the SOW. This fact was admitted by AEL's Vice President, John Watson, to Loral's Senior Vice President of Programs and Operations, Steven Kantor, during a private meeting in July 1990. In its other communications to Loral, however, AEL adopted the position that the Contract did not require it to perform the DADTA on the airborne equipment as installed on the RF–4 aircraft. AEL asserted that the Contract merely required AEL to perform the analysis on the Group A equipment prior to installation.

20. In presenting this argument, by letters dated March 20, 1990 and August 8, 1990, AEL relied on paragraph 3.3.8.3 of the SOW, which provides as follows:

> The modifications shall not alter the inherent structural integrity of the aircraft. The Group A structure added to support the EO–LOROPS Group B equipment is secondary structure which shall be installed without modification of the basic airframe and is not safety of flight critical. The subcontractor shall perform necessary [DADTA] on Group A Kit to insure the structural integrity of the RF–4C due to the installation of the EO–LOROPS hardware. In order to substantiate the structural integrity (as specified in MIL–STD–1530A) of the RF–4C aircraft, damage tolerance and durability analyses shall be performed on Group A kit in accordance with MIL–A–8344 and Mil–A–8866B, respectively ...

21. This paragraph of the SOW did not limit AEL's obligations under paragraph 4.3.2.10. This paragraph was intended to support the USAF's requirement that it be able to remove the Group A Kit from the RF–4C without performing additional analysis of the aircraft's load profile. The USAF's requirement is set forth in the immediately preceding paragraph, paragraph 3.3.8.2.1. By explicitly requiring the Group A Kit to be "secondary structure" and not "safety-of-flight critical," paragraph 3.3.8.3 would permit the USAF to remove the Group A Kit from the aircraft. The USAF would not be able to remove the Group A Kit were the Kit "primary structure" or "safety-of-flight critical."

22. During a meeting in July 1990, representatives of Loral and AEL discussed AEL's DADTA obligations. After this group meeting the meeting between Kantor and Watson referred to in Paragraph 19 above occurred. Kantor and Watson were charged with negotiating changes to the contract. Watson admitted to Kantor that AEL was contractually obligated to perform the DADTA analysis on both the Group A and Group B equipment as installed. Watson explained that AEL had intended to perform the DADTA at the time it accepted the contract, but that AEL later discovered that it had substantially underestimated the cost of the DADTA. Rather than absorbing the additional cost, AEL chose to try to force Loral to waive the DADTA requirement.

23. AEL's interpretation of paragraph 3.3.8.3 discussed above was developed in an attempt to convince Loral to relieve AEL of liability for performing the DADTA.

24. At the time AEL submitted its proposal to Loral, it had never performed the DADTA for any other projects. Brett Reedy, an AEL engineer assigned to review the proposal, was unsure of what the phrase "Airborne Equipment" in paragraph 4.3.2.10 of the SOW meant. AEL's inexperience explains its failure to accurately estimate the cost of the DADTA in the contract.

25. During the Watson–Kantor meeting, in an effort to resolve the DADTA issue, Kantor offered to consider a "teaming" arrangement between AEL and Loral for future government contract work. Shortly after the meeting AEL sent to Loral a letter which discusses such a "teaming" concept and "affirms the discussions held between Messrs. Cantor [sic] and Watson during our recent contract negotiations."

26. AEL introduced no testimony or exhibits to rebut Kantor's testimony regarding Watson's admissions.

27. Performing the DADTA on the Group A Kit alone, as suggested by AEL, would be meaningless. The installation of the Group A and Group B equipment within the RF–4C aircraft mandated a structural analysis of the impact of the installation of both types of equipment on the RF–4C aircraft's structural integrity. The DADTA could not be performed on the Group A Kit alone because the analysis by its nature studies the interaction of two items.

### G. Loral's Partial Termination of AEL for Default

28. On October 25, 1990, Loral notified AEL that, if AEL failed to provide the DADTA required by paragraph 4.3.2.10 of the SOW, Loral would find AEL in default and terminate AEL from that portion of the contract requiring the analysis.

29. AEL replied to Loral's October 25, 1990, letter, stating that it did not intend to perform the DADTA described in paragraph 4.3.2.10 of the SOW.

30. On December 5, 1990, Loral terminated AEL from that portion of the contract requiring the DADTA.

31. On February 26, 1991, Loral reprocured from McDonnell Douglas Corporation the DADTA described in paragraph 4.3.2.10. Loral made payments totalling $456,500 to McDonnell Douglas Corporation in compensation for this work.

32. Loral reduced its payments to AEL under the contract by $456,500, an amount equal to that paid by Loral to McDonnell Douglas.

### H. AEL's Change of Scope And Delay Claims [3]

33. AEL has submitted two Requests for Equitable Adjustment ("REA") to Loral seeking payment for work performed by AEL outside the scope of the contract and for expenses caused by Loral's delays.

34. The first claim, summarized in a document entitled "Request for Equitable Adjustment—Change of Scope Dated 26 Janu-

---

**3.** AEL's claims for delay damages and out of scope work are supported entirely by summary exhibits offered by AEL at trial. Loral moved at trial for the exclusion of these exhibits, and the Court took the matter under advisement. As explained in the Conclusions of Law at ¶¶ 14–20, Loral's motion will be granted, and the exhibits will be excluded from evidence. Even were the evidence to be considered, however, plaintiff's claims would fail, as discussed in ¶¶ 33–46 of the Findings of Fact and ¶¶ 21–38 of the Conclusions of Law.

ary 1994," ("Change of Scope REA") seeks $220,919.00 for alleged out of scope work relating to the following:

- Additional trial installation (April, 1992)     $103,015.00
- Changes to W–118 cables (January, 1992)     9,386.00
- Group B ECN-trial install (July, 1992)     43,638.00
- Qualification, test and evaluation in Reno (November, 1992)     32,436.00
- Incremental delivery of production kits (October, 1993)     3,872.00
- REA proposal preparation (September, 1993)     30,572.00

                $222,919.00

35. AEL submitted to Loral a second REA seeking money related to alleged delays to the project schedule entitled "Subcontract A–8323 Delay REA Submission" (hereinafter "Delay REA"). This claim was submitted in December 1994.

### 1. The Change Of Scope REA

36. AEL's Change of Scope REA and its back-up documents were prepared at various times by various employees of AEL including Jeffrey Adams, an engineer, Alex Carroll, AEL's contract manager, and Alan Boon, AEL's director of pricing.

37. The Change of Scope REA for additional trial installation work dated February 10, 1994 is a summary document that sets forth an estimate of hours of actual work performed. The documents supporting this REA contain a general summary of areas where extra work was performed.

38. Alan Boon was involved in preparing part of AEL's claim in late 1993, well after the work was allegedly performed. Mr. Boon was not involved in preparing any of the earlier documents attached to the February 10, 1994 REA and had no personal recollection or knowledge of the actual extra work allegedly performed. He had no personal knowledge of extra work performed task by task on a daily basis.

39. After receiving some indication in June 1993 that AEL expected to be compensated for an additional trial installation, Loral's subcontracts manager, Michael J. Marchesiello, wrote his counterpart, AEL's Alex Carroll, on September 10, 1993, seeking source material supporting any added scope changes. Mr. Marchesiello wrote:

> Specifically, explain the circumstances that have lead to the request for $200,000. This would include the basis of estimates, items impacted and why, time-line of delays, i.e. original due dates versus actual/revised dates. In addition, details supporting the $182,034.50 in added scope changes must be provided. Since these activities occurred in 1992, please provide copies of actual expense reports, time cards, etc. to support these amounts.

Mr. Marchesiello requested a response by September 13, 1993.

40. Shortly after the September 10 letter, Marchesiello conferred with Carroll by facsimile to schedule a meeting. A meeting occurred on September 21, 1993 between Marchesiello and Carroll; at this meeting AEL failed to produce the requested information. After the September 21 meeting, Loral wrote Carroll to confirm that AEL was unwilling to disclose and share with the Loral evidence of the actual overhead and other burden rates which were added to the alleged direct cost hourly rates and to suggest that this material be furnished under a confidentiality agreement. AEL did not agree to such a procedure, but did offer to submit to a government audit of the extra scope work. Loral did not act upon this proposal.

41. AEL did not produce evidence at trial to establish that the additional installation charged did not include work that was to have been done in the initial installation. Some extra work on the trial installation was performed at Loral's request, and some resulted from AEL's own inefficiencies, self-imposed cost overruns and schedule delays. Insufficient evidence was adduced at trial to permit the precise percentage of extra work attributable to Loral and AEL to be determined.

### 2. The Delay REA

42. AEL's Delay REA was provided to Loral sometime in December 1994. The text of the Delay REA set forth in the first three pages was written by Alex Carroll. The amount of monies to be assessed against

Loral was determined by Vince Hart, the present program manager for the AEL, who became involved in the EO–LOROPS project in January 1994. The Delay REA seeks to impose damages on Loral from December 1991 through the present due to alleged delays in the scheduling and rescheduling of kitproofing.

43. AEL did not produce any source material supporting the summary numbers representing hours of work performed by AEL related to the delay. As previously found in connection with AEL's Change of Scope REA, Loral requested back-up information as early as the September 10, 1993 letter from Marchesiello to Carroll.

44. The methodology employed in AEL's Delay REA is inadequate to establish if any causal connection existed between AEL's charges and the alleged delays, or whether any delays occurred at all.

45. For example, AEL contended at trial that it incurred 454 hours of extra labor for program administration as a result of delay. These 454 hours were approximately twenty per cent of the hours expended for program administration. AEL estimated that the additional eighty per cent of the hours would have been expended absent delay. No satisfactory explanation for this estimate was offered, and no budget figures by hours were presented for purposes of comparison.

46. A further example of AEL's lack of support for the assessed delay damages can be found in the 146 hours for program delay and 110 hours for program management stretch-out. Vince Hart simply established a "bucket of hours" for which he believed Loral was liable. Hart's rationale was as follows:

A delayed contract, you have to continue to report the status. Upper management wants to know what's the status, what are you doing, what have you found out, have they told you anything, when are we going to get on with this thing. And you're continually bombarded with requirements to provide data and opinion and you make phone calls, things like this to find out what's going on. You also have a problem, this delay—the proof kit installation requires the coordination between the ILS people and Aero people, the people that are going to do the observation and any engineering support.

This conclusory assessment does not establish that AEL's damages are real and substantial, or that they are causally connected to any delays caused by Loral.

### *Conclusions of Law*

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

A. *The Law Applicable to the Case*

■ 2. New York law is the applicable law in this case.

3. The contract between AEL and Loral, as evidenced by AEL's acceptance [4] of Loral's offer contained in Purchase Order A8323, specifically provides that New York law will govern the contract. AEL claims that its August 2, 1989 letter to Loral amounted to a counter offer, and the choice of law should be governed by a provision in a subsequent printed form sent by Loral. AEL, however, cannot undo what its August 2, 1989 letter already did, namely agree to Loral's offer of Purchase Order A8323 (containing a New York choice of law clause) thereby forming a contract with Loral.

■ 4. A "definite and seasonable expression of acceptance ... operates as an acceptance." N.Y.U.C.C. § 2–207(1) (McKinney's 1964).[5] This provision repudiates the common law principle, typically known as the "mirror image rule," that a response to an offer constitutes an acceptance only if the response "complies exactly with the require-

4. The August 2, 1989 letter reads as follows, "AEL Defense Corp. (AELDC) has received your above referenced purchase order and accepts this purchase order, subject to the following conditions[.]"

5. "A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms.*" N.Y.U.C.C. § 2–207(1) (McKinney's 1964) (emphasis added).

ments of the offer, omitting nothing from the promise or performance requested." Hawkland, *Uniform Commercial Code Series*, § 2–207:02, at 159 (1993) (*quoting Corinthian Pharmaceutical Systems, Inc. v. Lederle Lab.*, 724 F.Supp. 605 (S.D.Ind.1989)).[6] Thus, a response to an offer may constitute an acceptance, despite the presence of different or additional terms. N.Y.U.C.C. § 2–207 (McKinney's 1964).

5. Only by making acceptance "expressly conditional on assent to the additional or different terms," may an offeree's response be treated as a counter offer, rather than as an expression of acceptance. In determining whether an offeree's response shall be viewed as an acceptance or a counter offer (because of the presence of additional or different terms), reviewing courts have strictly interpreted the language of Section 2–207(1). The language "Subject to the Terms and Conditions" does not satisfy the expressly conditional requirement of Section 2–207(1). *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*, 687 F.Supp. 820, 827 (S.D.N.Y.), *aff'd*, 895 F.2d 1410 (2d Cir.1989). By contrast, language in a response to an offer reading "[i]f the terms and conditions of this acknowledgement differ in any way from the terms and conditions of [the offer] the acknowledgement shall be construed as a counter offer and shall not be effective as an acceptance" does satisfy the requirements of Section 2–207(1) and amount to a counter offer. *American Tempering, Inc. v. Craft Architectural Metals Corp.*, 107 A.D.2d 565, 483 N.Y.S.2d 304, 305 (1985). In sum, under New York law, unless the offeree employs the identical language contained in Section 2–207(1) when referring to additional or differ-

ent terms, the offeree's response will constitute an acceptance.

6. Applying these principles to the instant case, AEL's August 2, 1989 letter represents an "expression of acceptance" and therefore incorporates the New York choice of law provision of Purchase Order A8323. AEL's August 2, 1989 letter "accepts" Purchase Order A8323, "subject to the following conditions[.]" This language is identical to the language contained in the response in *St. Charles Cable*, where the court found the language insufficient to satisfy the "expressly made conditional" requirement of Section 2–207(1), and thus held that the response was an acceptance. *St. Charles Cable*, 687 F.Supp. at 827. As courts have made clear, absent the "acceptance is expressly made conditional on assent" language, such additional or different terms will not preclude the response from constituting an acceptance under New York law. *E.g. American Tempering*, 483 N.Y.S.2d at 305. Therefore, AEL's letter constituted an acceptance and the parties are bound by the terms of Purchase Order A8323, which included the New York choice of law provision.[7]

### B. *Loral's Partial Termination For Default*

7. The contract requires AEL to perform the DADTA on both the Group A and Group B equipment as installed on the RF–4C aircraft. This conclusion is mandated by section 4.2.3.10 of the Contract.

8. AEL's reading of the contract, that the contract merely requires AEL to perform DADTA on the Group A Kit alone, would render 4.3.2.10 meaningless. AEL argues that paragraph 3.3.8.3 of the SOW modifies AEL's obligations without regard to the provisions of paragraph 4.3.2.10.[8] Such an inter-

6. Article 2 of the Uniform Commercial Code applies to the sale of goods. N.Y.U.C.C. § 2–102 (McKinney's 1964). In pertinent part, Section 2–105(1) defines goods for the purposes of the U.C.C. as all things which are movable at the time of identification to the contract. The contract between Loral and AEL called for the production of a mount for the cameras. Because the mounts were movable at the time of identification to the contract, they constitute goods, and the U.C.C. governs the contracts.

7. With respect to the additional or different terms listed in the August 2, 1989 letter, Sections

2–207(2) and (3) would guide the court as to which terms are part of the contract. Given that AEL failed to mention choice of law in its response, the contract's particular choice of law would not be in dispute between the parties, and thus would not be subject to Section 2–207(2) and (3) analysis. Therefore, Purchase Order A8323's New York choice of law would be binding on the parties.

8. Similarly, AEL's interpretation would render meaningless paragraph 4.1.1 of the Statement of Work—which requires the Group A subcontrac-

pretation is to be avoided. *Restatement of Contracts, Second* § 202(d) ("the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other") and Comment d ("Where the whole can be read to give significance to each part, that reading is preferred ...").

9. Loral's reading, by contrast, gives equal effect to both paragraph 4.3.2.10 and paragraph 3.3.8.3. Under Loral's interpretation, 3.3.8.3 is not inconsistent with 4.3.2.10 because it addresses a different, unrelated contract requirement, the USAF's requirement that the Group A Kit be removable from the RF–4C aircraft without requiring additional data analysis or testing. Paragraph 3.3.8.3 was not intended to limit or modify in any way AEL's data analysis obligations as set forth in paragraph 4.3.2.10.

10. AEL's position is inconsistent with its actions and representations during the drafting and submission of its bid proposal. AEL made a careful review of each of the data analysis requirements contained in Loral's solicitation. AEL "sanitized" the solicitation, removing those data analysis tasks which, in its view, may have been applicable to the prime contract but which were not necessary for the subcontract. In the course of this "sanitizing," AEL alerted Loral to those data analyses which were unnecessary or should be modified. AEL's careful focus on these analyses strongly suggests that, had AEL believed that CDRLs A039 and A040 should be limited in scope, AEL would have alerted Loral to this conclusion by qualifying its bid proposal. AEL's failure to so qualify its proposal can be read as a manifestation of its intention to fully perform the DADTA described in paragraph 4.3.2.10 at the time it accepted Loral's contract offer in July 1989.

11. AEL's position also is inconsistent with its actions during the negotiation and performance of the contract. AEL's Watson confided to Loral's Kantor in July 1990 that AEL, in preparing its response to Loral's solicitation, had grossly miscalculated the cost of the DADTA. As a result, AEL was under financial pressure. Upon discovering its miscalculation, AEL sought to enforce an

interpretation of the contract that shifted responsibility for the analysis back to Loral.

12. AEL bears the burden of proving facts which would establish any remedial rights. *British American & Eastern Co., Inc. v. Wirth Ltd.,* 592 F.2d 75, 78 (2d Cir. 1979) ("New York law ... clearly places the burden of proof upon the plaintiff"). Therefore, to recover any damages, AEL must establish by a preponderance of the evidence that the contract did not require AEL to perform CDRL's A039 and A040.

13. Under New York law, AEL's burden of proof is shifted to Loral only on the threshold issue of whether AEL anticipatorily repudiated the contract. *Bausch & Lomb Inc. v. Sonomed Technology, Inc.,* 780 F.Supp. 943, 963 (E.D.N.Y.1992) (it is "well settled under New York law that the party claiming anticipatory repudiation bears burden of proof on the issue"), *aff'd in part, rev'd on other grounds,* 977 F.2d 720 (2d Cir.1992); *Record Club of American, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1275 (2d Cir.1989).

14. Therefore, though Loral has the burden of proving that AEL anticipatorily repudiated the contract, it does not have the burden of proof with respect to AEL's claim regarding its interpretation of CDRLs A039 and A040.

15. An anticipatory repudiation occurs whenever there is an overt communication of a "positive and unequivocal" intention not to perform. *Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 408 N.Y.S.2d 36, 38, 379 N.E.2d 1166, 1167–68 (1978) (anticipatory repudiation found when party overtly communicated that it would not accept television sets that were subject of contract). Further, the party claiming the anticipatory repudiation must show that the intention not to perform was positive and unequivocal. White & Summers, *Uniform Commercial Code,* § 6–2 at 172.

16. AEL's letter communicating its intention not to perform the structural analysis constitutes an anticipatory repudiation. Because the contract required AEL to per-

tor to "meet all ... MIL–STDs" set forth in the    Statement of Work.

form the DADTA specified in paragraph 4.3.2.10 on the RF–4C aircraft, AEL's communication on October 25, 1990, stating that it did not intend to perform the DADTA, repudiated the contract. *Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 408 N.Y.S.2d 36, 38, 379 N.E.2d 1166, 1167–68 (1978)

17. In the face of AEL's repudiation, Loral was justified in partially terminating the Contract for default by AEL. *Restatement of Contracts, Second* § 253(2) ("Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance.")

C. *The Delay And Out–Of–Scope Claims*

■ 18. Loral's Motion to Exclude Evidence, directed towards AEL's proffered Exhibits 45, 46, 47 and 58, must be granted.[9]

19. The proffered exhibits were compiled from accounting labor runs, which were in turn compiled from time cards submitted by AEL employees. As such, they contain several levels of hearsay and must be excluded unless they meet one of the codified exceptions to the hearsay rule. Fed.R.Evid. 801, 802.

20. AEL asserts that the offered exhibits meet the business records exception, which provides for admission of any:

> ... report ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the ordinary course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... report ...

Fed.R.Evid. 803(6). The burden of proving the elements of this exception falls on the party seeking admission of the evidence. *In re Japanese Elec. Prod. Antitrust Litigation,* 723 F.2d 238, 288 (3d Cir.1983), *rev'd in part*

*on other grounds,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). AEL has failed to meet this burden.

21. The AEL employees preparing the exhibits had no personal knowledge of the underlying expenses, nor did those creating the accounting records that the preparers of the exhibits relied upon. For this reason alone, the exhibits do not meet the requirements of Rule 803(6). *United States v. Furst,* 886 F.2d 558, 572 (3d Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990). Moreover, AEL prepared the exhibits in question long after the time that the underlying expenses were incurred, and prepared them in anticipation of litigation, not in the regular course of business. Therefore, the exhibits are hearsay and must be excluded. Fed.R.Evid. 801, 803(6).

■ 22. The rule regarding summaries provides:

> [t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, *shall be made available* for examination or copying, or both, by other parties ...

Fed.R.Evid. 1006 (emphasis added).

23. The exhibits offered by AEL are summaries of the costs allegedly incurred as a result of the delay and additional work performed. AEL admitted at trial that it had failed to make available to Loral the time cards that formed the basis of these claims. For this reason, the exhibits must be excluded as violative of Fed.R.Evid. 1006.

24. Without Exhibits 45, 46, 47 and 58, AEL has no competent evidence of record to support its claims for delay damages or for out of scope work performed. Therefore,

9. Loral raises four arguments in support of its motion: 1) that the exhibits fail to establish the necessary proof required to entitle plaintiff to relief, 2) that the evidence violates the rule against hearsay, 3) that the evidence violates the evidentiary rule regarding summaries, and 4) that the plaintiff failed to provide source documentation during discovery. The first argument is addressed to the weight that should be given the evidence, not its admissibility. The fourth asks the Court to exercise its discretion under Fed.R.Civ.P. 37(b) and order the evidence excluded for failure to comply with discovery requirements. Because this Court finds the proffered evidence inadmissible under both the hearsay rule and the best evidence rule, the issue of the alleged discovery violation need not be reached.

Loral is entitled to entry of judgment on these claims.

■ 25. Even had Exhibits 45, 46, 47 and 58 been admitted, AEL's claims for delay and out of scope damages would fail because the proffered exhibits are insufficient to meet AEL's burden of proof on these issues.[10]

26. As discussed above, AEL bears the burden of proving facts which would establish any remedial rights. *British American & Eastern Co.,* 592 F.2d at 78.[11] Therefore, to recover any damages, AEL must establish by a preponderance of the evidence that it performed work outside the scope of the contract and that it suffered damages from Loral's delay. AEL must further prove the amount and costs of the out of scope work and the amount and costs of extra work required because of the delay. Finally, AEL must prove a causal relation between any alleged delay and increased costs.

27. AEL's Delay REA seeks $124,148.00 from Loral. The main components of the AEL's delay claim are: 1) $89,734 in delay and disruption to program management, 2) $24,519 in escalation impact, and 3) $9,895 in the REA preparation. Further, AEL's Change of Scope REA seeks $222,919.00. The main elements of its change of scope claim are: 1) $103,015 in additional trial installation (April, 1992), 2) $9,386 in changes to W–118 cables (January, 1992), 3) $43,638 in Group B ECN-trial install (July, 1992), 4) $32,436 in qualification, test and evaluation in Reno (November, 1992), 5) $3,872 in incremental delivery of production kits, and 6) $30,572 in REA proposal preparation.

■ 28. AEL is entitled to recovery only to the extent it meets its burden of proving the extent of the harm it allegedly suffered. *Berley Indus., Inc. v. City of New York,* 45 N.Y.2d 683, 412 N.Y.S.2d 589, 591, 385 N.E.2d 281, 282–83 (1978); *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99 (1928). Delay and disruption claims prove no exception to this fundamental principle. *Berley Indus.,* 412 N.Y.S.2d at 591, 385 N.E.2d at 282–83 (contractor wrongfully delayed must establish the extent to which its costs increased by the improper act because its recovery will be limited to damages actually sustained); *Peter Scalamandre & Sons, Inc. v. Village Dock, Inc.,* 187 A.D.2d 496, 589 N.Y.S.2d 191, 191 (1992) (damages for delay are measured by "the extent to which ... costs were increased ... and recovery will be limited to damages actually sustained"), *appeal denied,* 81 N.Y.2d 710, 600 N.Y.S.2d 197, 616 N.E.2d 854 (1993). Thus, AEL must prove the extent to which its costs actually increased due to the alleged delays caused by Loral.

29. Further, New York law will not countenance damage awards based on "speculation and conjecture." *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.,* 946 F.2d 1003, 1010 (2d Cir.1991) (*quoting Berley Indus.,* 412 N.Y.S.2d at 591, 385 N.E.2d at 283). Moreover, New York law requires there to be a "definite and logical connection between what is proved and the damages a [court] is asked to find." *Trademark Research Corp. v. Maxwell Online, Inc.,* 995 F.2d 326, 334 (2d Cir.1993) (*quoting Berley Indus.,* 412 N.Y.S.2d at 591, 385 N.E.2d at 283). By contrast, courts must reject damage awards based on "unreliable approximation." *Novak & Co. v. Facilities Dev. Corp.,* 116 A.D.2d 891, 498 N.Y.S.2d 492, 494 (1986) ("cost overruns are part of competitive bidding").

30. With respect to the method of computation employed under New York law for total cost claims,[12] the first step is to ascertain the total damages, which is the difference between the contract price for the particular work at issue and the total job costs. To prevent plaintiffs' recovery for non-actionable causes or their own errors in the project, the courts shall apportion the costs according to each party's responsibility. *Wolff & Munier,* 946 F.2d at 1010.

31. In *Trademark Research,* the plaintiff sought damages for costs associated with

---

10. See note 2, *supra.*

11. See Conclusions of Law ¶ 12, *supra.*

12. The "total cost" method for establishing damages appears to be the least preferred method for establishing damages. *Thalle Constr. Co., Inc. v. Whiting–Turner Contracting Co. Inc.,* 39 F.3d 412, 417 (2d Cir.1994).

delays caused by the defendant for, *inter alia,* the money spent "gearing up" for the defendant's services and maintaining the status quo at the company during the alleged period of delay. *Trademark Research,* 995 F.2d at 335. To prove its damages, an accounting expert formulated twenty categories of expenditures, and then "provided *detailed explanations as to which portion was wasted and which portion was attributable to ordinary operations ...*" Id.

32. By contrast, to compute its damages, AEL took its total costs for Program Support between December 1991 and September 1994, and allocated twenty per cent of the total costs to its delay through estimation.

33. Whereas the damages sought in *Trademark Research* are analogous to those sought by AEL, the level of proof is wholly distinguishable, and demonstrates AEL's failure to prove its damages. In *Trademark Research,* the plaintiff relied on an expert to provide detailed explanations as to the formula[13] employed to separate costs from damages. *Id.* at 335. Here, Vince Hart, a claims employee with no advanced degrees in finance or accounting, was responsible for the Delay REA and neglected to employ any formula to apportion the fabrication costs and the delay costs. Rather, Mr. Hart made "value judgments" in coming up with the twenty per cent figure.[14] *Compare e.g., Fehlhaber Corp. v. State,* 69 A.D.2d 362, 419 N.Y.S.2d 773, 775–776 (1979) (recovery upheld when records were maintained "on a daily basis and meticulously recorded the number of men and machines on the job as well as the type of work being done each day"). AEL's method of computation for its total alleged delay costs is wholly premised on "speculation and conjecture," and not compensable under New York law.

34. Moreover, because AEL was not able to detail with any source data what specific work was being performed during the periods of alleged delay, AEL failed to provide any "definite and logical connection" between the evidence submitted and the damages sought. *See Berley Industries,* 412 N.Y.S.2d at 591, 385 N.E.2d at 282–83.

35. In addition to its failure to establish its increased costs, AEL is precluded from recovery because of its failure to provide the contract price for the particular work at issue in the delay claim, as required by New York law. *See Thalle Constr.,* 39 F.3d at 417; *Wolff & Munier,* 946 F.2d at 1010.

36. New York law requires AEL to establish with reasonable certainty the specific delays "directly attributable" to Loral's conduct. *Rao Elec. Equip. Co. v. State,* 36 A.D.2d 1019, 321 N.Y.S.2d 670, 671–672 (1971). To meet its burden, AEL must calculate in "concrete terms" its increased costs, and "causally relate" any increased costs to delay. *Savin Bros., Inc. v. State,* 62 A.D.2d 511, 405 N.Y.S.2d 516, 520 (1978), *aff'd,* 47 N.Y.2d 934, 419 N.Y.S.2d 969, 393 N.E.2d 1041 (1979).

37. As previously discussed, rather than "causally relat[ing] any increased costs to delay," as required by New York law, AEL provided only anecdotal evidence which sought to give rise to any inference of, but failed to establish, Loral's connection to AEL's increased costs. Because AEL failed to detail the scope of the work performed, or to provide adequate backup and source data to establish the nature of the work performed, AEL did not causally connect its costs to Loral's conduct.

38. AEL's Change of Scope REA fails for the same reasons, namely its failure to meet its burden of proof with respect to providing

**13.** In *Trademark Research,* the Court of Appeals for the Second Circuit labelled the accountant's method of calculation as "questionable, although not legally insufficient." *Id.* at 335. There, the accountant calculated the average percentage of revenues for a particular expense category for the three years prior to the delay, and then applied the resulting percentage to the years when the alleged delay took place. Given that the court labelled this formula questionable, Mr. Hart's "value judgment" formula would appear to prove legally insufficient for the purposes of calculating the plaintiff's damages.

**14.** This revelation proves especially damaging to plaintiff's claim inasmuch as it tried to portray the costs attributed to delay as comprised of "discrete hours charged to specially established Work Authorizations...."

adequate backup and source data to evidence its change of scope claim.